[765 NYS2d 575]

Richbell Information Services, Inc., et al., Appellants, v
Jupiter Partners, L.P., et al., Respondents.

First Department, September 23, 2003

## APPEARANCES OF COUNSEL

*Thomas I. Sheridan, III* of counsel *(Charles E. Dorkey, III, Steven R. Schoenfeld, David Sack* and *Donald J. Kravet* on the brief; *Torys LLP* and *Kravet & Vogel, LLP*, attorneys), for appellants.

*Julie A. North, Michael B. Miller* and *Howard W. Goldstein* of counsel *(Elliot G. Sagor, Robert M. Osgood, Andrew T. Gardner* and *Kirsa Phillips* on the brief; *Cravath, Swaine & Moore, Sullivan & Cromwell LLP, Fried, Frank, Harris, Shriver & Jacobson* and *Hogan & Hartson L.L.P.*, attorneys), for respondents.

## OPINION OF THE COURT

SAXE, J.

In this action, plaintiffs allege that defendants engaged in a highly sophisticated scheme to misappropriate plaintiffs' interest in an alleged joint venture worth over $600 million. The complaint seeks recovery under theories of breach of contract, breach of fiduciary duty and various business torts. Defendants moved for dismissal pursuant to CPLR 3211 on various grounds, including documentary evidence and failure to state a cause of action, and, as to two of the defendants, lack of personal jurisdiction. The motion court dismissed each of the 33 causes of action contained in plaintiffs' 180-page complaint, essentially adopting defendants' arguments.

It bears repeating that, "[i]n the posture of defendants' CPLR 3211 motion to dismiss, our task is to determine whether plaintiffs' pleadings state a cause of action. The motion must be denied if from the pleadings' four corners 'factual allegations are discerned which taken together manifest any cause of action cognizable at law'" (*511 W. 232nd Owners Corp. v Jennifer Realty Corp.*, 98 NY2d 144, 151-152 [2002] [citation omitted]). We must construe the complaint liberally, and accept as true the facts alleged in the complaint and any submissions in opposition to the dismissal motion, and accord plaintiffs the benefit of every possible favorable inference (*id.* at 152). Moreover, when the motion is based upon documentary evidence, "[d]ismissal under CPLR 3211 (a) (1) is warranted 'only if the documentary evidence submitted *conclusively establishes a defense to the asserted claims as a matter of law*'" (*id.* [emphasis added], quoting *Leon v Martinez*, 84 NY2d 83, 88 [1994], and citing Siegel, NY Prac § 269, at 428 [3d ed]; *see also Goshen v Mutual Life Ins. Co.*, 98 NY2d 314, 326 [2002]).

We conclude that with respect to three of the causes of action, the motion court improperly rejected the factual allega-

tions of the complaint, and unduly relied upon the documentary evidence submitted by defendants pursuant to CPLR 3211 (a) (1) to establish that no joint venture had been formed at the time of the alleged misconduct, erroneously viewing the submitted materials as dispositive when they merely permitted, but did not require, the interpretation propounded by defendants.

## The Amended Verified Complaint

As alleged in the complaint, plaintiff David Elias, a British citizen, owns and controls plaintiff The Richbell Group Limited (Richbell), which owns, inter alia, plaintiff Richbell Information Services, Inc. (RIS). Through Richbell, Elias indirectly owned and controlled The Harpur Group Limited (Harpur), a business which by 1994 was worth $167 million.

Defendant Jupiter Partners (Jupiter), an investment firm, is a Delaware limited partnership. The remaining defendants are principals or general partners of Jupiter: defendants Ganymede and Europa are also Delaware limited partnerships, Europa being a general partner of Ganymede, which is a general partner of Jupiter. Defendants Sprague and Blumer are general partners of Europa and principals of Jupiter.

Defendant RIT Capital Partners (RIT) is a United Kingdom investment company chaired by Lord Rothschild. Defendant Atlantic and General Investment Trust (AGIT) is a United Kingdom wholly owned subsidiary of RIT.

Plaintiffs allege that in 1994 they contributed their equity interests in Harpur, and defendants Jupiter and RIT contributed cash, and they formed H-G Holdings, Inc. (H-G) as a corporate vehicle to carry out a joint venture to acquire Gelco Payment Systems, Inc. (Gelco) and combine it with Harpur.

Specifically, in the spring of 1994, Elias approached RIT to find a United States financial partner to join in acquiring Gelco Payments Systems, Inc., a United States company in the business of expense and payment processing and management information services. A deadline of July 8, 1994 had been set by Gelco's seller for submission of offers to purchase.

In June 1994, Elias spoke with Jupiter's principals, Sprague and Blumer. The parameters of the deal for the acquisition of Gelco were that plaintiffs would contribute their equity interests in Harpur, that defendants Jupiter and RIT would contribute cash, and that a holding company named H-G Holdings, Inc. would be formed as the corporate vehicle to carry out a joint venture to acquire Gelco and combine it with Harpur. Under this alleged agreement, each side would contribute prop-

erty, share in the profits and share in the losses to the extent of their investments, and the venture's assets would be controlled through H-G.

At a July 6, 1994 meeting, Elias proposed that Jupiter invest $80.5 million and that the venture borrow an additional $100 million. Jupiter, through Sprague, said there was not enough time to obtain the bank loan prior to the acquisition, but assured Elias such amount could be borrowed later and distributed to shareholders as a return of capital.

Plaintiffs allege that Jupiter knew that, without the bank loan at the inception of the joint venture, Richbell would not have enough cash to pay its liabilities going forward, and that Jupiter intended to structure the transaction to keep Richbell in debt so it would later be vulnerable to defendants' predatory tactics.

It is alleged that Jupiter agreed to participate in the H-G joint venture based on terms Elias had outlined in a July 6 memo; Sprague said he would send a term sheet memorializing what had been agreed upon at the meeting.

On July 8, Richbell, acting in its own name but allegedly on behalf of the joint venture, made a binding offer to acquire Gelco for $65 million. Later that day, Jupiter wrote to Richbell, attaching a detailed "Preliminary Term Sheet" also dated July 8.

As characterized in the complaint, the letter stated that the attached "draft" term sheet is different from the deal structure outlined in the July 6 documents "in three critical respects." The letter itself stated that the attached term sheet is "rather comprehensive" and "restates" many of the basic assumptions concerning the proposed sources and uses of funds for the transaction, but pointed out that it *also* included "certain provisions we did not talk about specifically yesterday but which are relatively standard for large minority blocks of this sort, such as * * * veto rights on major corporate transactions."

The July 8 letter further stated that Jupiter anticipated being able to complete its due diligence over the next two weeks, and "propose[d] that our term sheet, once it is agreed to between us, become the basis of an agreement-in-principle."

On July 22, Jupiter sent a new letter and preliminary term sheet. Unlike the July 8 letter, it expressly conditioned Jupiter's assent upon a formal agreement:

> "[O]ur willingness to complete the transactions contemplated by this letter is subject to the execu-

tion of definitive agreements between us * * * . Except for [certain paragraphs] this letter is not and is not intended to be a legally binding agreement. Neither of us shall be liable to the other except as provided in such definitive agreements."

On August 5, Jupiter sent Richbell a further revised term sheet, which, as characterized in the complaint, was "so different from the Term Sheet sent to Elias on July 8 as to constitute a different transaction." The accompanying letter stated that the transaction was subject to a definitive agreement and was not intended to be binding.

Formal agreements were drawn up along the lines of this term sheet. Jupiter contributed $85 million (more than the amount initially proposed) and plaintiffs contributed their Harpur equity.

The parties formed a corporation, H-G, to hold their interests in the combined Harpur-Gelco; 95% was owned by the joint venturers or their nominees, and 5% by management that was not part of the joint venture.

On October 13, 1994, the parties entered into the H-G stockholder agreement; Richbell and Elias were not named parties, but claim interests therein through Elias-controlled entities as their nominees (first The Northington Group, later RIS).

The stockholder agreement provided for different classes of stock. Based on the differences, Jupiter's investment was more conservative and Richbell-Elias's had greater "upside potential." (RIT was unaffected by the differences between the classes of stock, because it held equal numbers of each.) Jupiter would get an extra share of the return if under 41% growth was achieved, and Richbell would get a return of its capital only if 41% growth was achieved. This protected Jupiter if Elias did not manage the business as successfully as was hoped and rewarded Elias if he achieved a higher level of performance. However, upon certain "realization" events, such as an initial public offering (IPO), Richbell stood to receive a much higher percentage of the gain.

Section 3.2 of the stockholder agreement required Jupiter's consent for an IPO of H-G stock. Before signing it, Sprague allegedly told Elias that this veto right, first added by the July 8 letter and term sheet, was merely for defensive purposes, since Elias would be managing the company on a day-to-day basis and Jupiter would not. Sprague allegedly assured Elias that Jupiter would never use its veto rights in an unfair or exploitative way, but only for its own protection.

The stockholder agreement also gave Jupiter the right to exercise voting control over plaintiffs' shares if H-G's performance fell below a certain level. Jupiter further had the right to enforce a certain 8.9 million pound note issued to Harpur when the agreement was executed (the Northington note) and to exercise such voting control if Richbell defaulted on the note. By exercising voting control, Jupiter could appoint six of H-G's seven board members.

The stockholder agreement contained a merger clause: It was the entire agreement between the parties, superseding all prior agreements, written or oral, with respect to its subject matter (§ 10.7) and could be amended only by writings signed by the parties (§ 10.3).

The Gelco closing took place October 13, 1994. The parties then valued the combined Harpur-Gelco at $261 million.

As a result of its success, H-G had investment bankers begin work on an IPO. In late March 1996, the bankers allegedly valued H-G at $415-650 million. As revealed in one of their reports, Jupiter was already telling the bankers that Elias would no longer be managing the business and would be selling his stock.

Certain Richbell investors had purchased "loan stock" giving them equity in Richbell and the right to redeem it. The increase in value caused many to seek redemption, leading to a liquidity problem for Richbell.

Aware of Richbell's problem, of its apparent eagerness to proceed with an IPO, and mindful as well of Richbell's potential bonus, it is alleged that Jupiter decided to use its IPO veto right as leverage to obtain a larger share of profits. It invoked this right, despite having expressly stated that an IPO was in H-G's best interests.

Richbell could not raise cash by other means. Jupiter also had veto power over the sale of shares and share-collateralized borrowing, and blocked Richbell from borrowing from anyone other than RIT.

In April 1996, Jupiter, RIT and plaintiffs reached an agreement. Plaintiffs were given the liquidity they sought and it was agreed the IPO would proceed by January 1997.

Jupiter exacted a steep price: RIT (through its AGIT subsidiary) would extend to plaintiffs a $30 million loan at 25% interest (the AGIT note), secured by all of plaintiffs' H-G shares and due December 31, 1997 (one year after the IPO was scheduled); Elias would resign as H-G's CEO; plaintiffs would cede to

Jupiter 12.4% of their shares in H-G, allegedly worth $50-80 million.

This agreement was memorialized in an April 18, 1996 "Memo of Understanding" from RIT's Paul Griffiths to Elias and Sprague. It is not signed by representatives of Jupiter or any of the defendants, other than RIT.

On April 21, Griffiths took Elias aside to review the memo, repeatedly assuring him RIT would use its "best efforts" to ensure Jupiter's compliance with its representations. Allegedly, these assurances were false, with Griffiths acting as Jupiter's agent to induce Elias's assent; in reality, Jupiter never intended to comply. Moreover, plaintiffs contend, these discussions constituted a separately enforceable oral contract by RIT to use its "best efforts" to obtain Jupiter's compliance by voting its stock and its position on H-G's board.

The AGIT note was executed on April 22, 1996. It provided that it was to be governed by English law. Though denominated by plaintiffs a "bridge" loan, repayment was not contingent upon the occurrence of any future event (such as an IPO).

Plaintiffs performed their part of the April 1996 agreement, reducing their share in H-G and pledging their H-G interest as loan collateral; Elias resigned as CEO. However, it is alleged that defendants orchestrated a default on the note in order to buy plaintiffs' H-G stock at an artificially low price. They allegedly intended to breach the agreement and block the IPO, thereby depriving plaintiffs of funds to repay the AGIT note, inducing a default and foreclosing on the pledged H-G stock.

Unbeknownst to plaintiffs, defendants had entered into a "bid rigging agreement" in September 1996 (memorialized in a January 31, 1997 written agreement among Jupiter, RIT and AGIT) to ensure plaintiffs' default so that defendants would obtain their H-G shares. Jupiter and RIT allegedly agreed to block any IPO, and then participate in a collusive foreclosure sale in which they would bid no more than the $30 million loan amount (though the collateral was worth much more) and split the true value of plaintiffs' shares.

Thus, under this "secret" agreement, RIT agreed that, in the event of default on the note, Jupiter would purchase a portion of the note in exchange for the right to control the foreclosure and then to vote the Richbell shares in H-G and designate RIT's nominee to H-G's board. If the collateral was insufficient to cover the debt to RIT, Jupiter would insure any shortfall to RIT by making up the difference between the actual value of

the collateral and the amount remaining due, up to $27 million. On the other hand, if the collateral turned out to be worth more than the debt, they agreed to retain the (actual value) surplus, as shown by a September 1996 Jupiter internal memo submitted by plaintiffs.

Richbell would be entitled to any surplus above the amount of the debt. Plaintiffs allege that, to ensure nothing would be left for Richbell, Jupiter and RIT decided to keep the foreclosure sale price for Richbell's pledged shares artificially low by agreeing that it would not exceed the debt. In other words, they would recoup actual value, but such value would not be reflected in the sale price so there would be no "surplus" for purposes of the debtor.

Prior to the maturity date of the $30 million AGIT note, Jupiter and RIT caused H-G to agree to sell over $200 million worth of Harpur assets, but they deliberately delayed the closing until after the loan was due and then refused to give plaintiffs their share of the sale proceeds.

Under the shareholder agreement, the sale of such assets was to be included in calculating the venture's profits, resulting in an increased rate of return entitling plaintiffs to a bonus profit; it also increased the value of plaintiffs' pledged stock, allegedly well beyond the amount of the loan. The refusal to provide these funds, combined with defendants' continued refusal to do an IPO, prevented plaintiffs from repaying the $30 million and realizing any value for their interests.

In April 1997, Harpur brought a winding-up petition in England based on Richbell's default on the Northington note. In May 1977 AGIT thereafter declared a default on the AGIT note, and in March 1998, AGIT transferred to itself Richbell's shares in H-G, without notice to Richbell. Ultimately, in May 1998, AGIT brought a winding-up petition against plaintiff Richbell Information Services, Inc., the Elias-controlled nominee of Richbell under the H-G stockholders' agreement. As this Court has previously noted, all three plaintiffs were forced into bankruptcy in the United Kingdom (*see* 280 AD2d 208, 211-212 [2001]).

The complaint seeks relief under numerous theories:

*Breach of fiduciary duty*: Plaintiffs maintain that Jupiter and RIT were fellow joint venturers with plaintiffs in forming H-G to acquire Gelco, and owed plaintiffs fiduciary duties; they were also shareholders in a closely held corporation, H-G, and owed fiduciary duties on that basis. Jupiter's and RIT's actions

constituted breaches of those fiduciary duties, and the other defendants are liable for knowingly participating in these breaches.

*Breach of contract*: Defendants breached the April 1996 agreement and the 1996 RIT agreement by failing to use their best efforts to launch an IPO.

*Breach of implied covenant of good faith*: Defendants acted in bad faith in denying plaintiffs the benefits of the H-G stockholders agreement by depriving plaintiffs of their interest in H-G.

*Promissory estoppel*: The promises made by defendants in April 1996 induced plaintiffs' reasonable reliance. (Richbell also asserts that estoppel arises from its reliance on the alleged July 6, 1994 agreement.)

*Fraud*: Plaintiffs relied to their detriment on defendants' false representations.

*Foreclosure Bid Rigging*: The collusive plan to cause plaintiffs' default on the AGIT note and make a low bid for the pledged H-G shares upon foreclosure constituted fraud, breach of fiduciary duty, breach of the implied covenant of good faith and breach of a secured creditor's duties toward its debtor.

*Conversion*: The alleged misappropriation of plaintiffs' interest in H-G constituted conversion.

### Discussion

#### Joint Venture

The court held that the pleadings did not establish the existence of a joint venture, so no fiduciary obligations arose. It also reviewed the documentary evidence submitted by defendants and concluded that it demonstrated the absence of a joint venture. In particular, the court found that, at the time of the bid to purchase Gelco in July 1994, there were only preliminary nonbinding negotiations. Even the formation of H-G did not evince a joint venture, it held, because the negotiations to that point were adversarial and the parties structured H-G specifically to protect each side from the other.

Further, the court concluded that the shareholder agreement failed to establish a joint venture, finding that, at most, it showed an agreement to share proceeds, and, rather than providing for the sharing of losses, it gave Jupiter special protection in case of underperformance. Also, because the shareholder agreement does not reflect that the parties reserved any rights for the alleged joint venture to exercise in-

dependently, the court concluded that the shareholder agreement shows they intended to conduct business through the corporate form and not through a joint venture.

The motion court further ruled that no fiduciary duties arose from the parties' relationship as shareholders in the closely held corporation, H-G. It reasoned that, while a fiduciary relationship may arise where the shareholders act as de facto partners, it does not arise where, as here, they lack a close working relationship.

Finally, the court found that, even if, arguendo, there were a fiduciary relationship, the allegations of misconduct did not amount to a breach. Defendants were not obligated to exercise their contractual rights in a manner that would accommodate plaintiffs' financial difficulties.

The motion court correctly determined that the parties were not members of a joint venture by virtue of *express written agreements*. The July 8 letter referred to Jupiter's as yet uncompleted due diligence, and used language reflecting that an agreement might be reached at some time in the future, but had not been reached so far and, moreover, referred to the attached term sheet as a "draft"; the term sheet itself was labeled "preliminary." This is a classic example of an unenforceable "mere agreement to agree." Indeed, we recognize that term sheets, such as those used here, will not support a claim of breach of contract or of the duty of good faith (*Kreiss v McCown DeLeeuw & Co.*, 37 F Supp 2d 294, 301 [1999]; *Health & Community Living, Inc. v Goldis Fin. Group, Inc.*, 1998 WL 117928, *5, 1998 US Dist LEXIS 3069, *12-14 [ED NY, Mar. 13, 1998]). Further, the July 22 letter accompanying a new term sheet clearly conditioned the transaction upon the execution of definitive agreements.

Nevertheless, the court erred in dismissing the first and second causes of action, premised on the breach of a fiduciary duty created by the joint venture. While the documents do not establish an express agreement to form a joint venture, nor do they "utterly refute[ ] plaintiff's factual allegations, conclusively establishing a defense as a matter of law" (*see Goshen v Mutual Life Ins. Co.*, 98 NY2d at 326). The intention to commit an agreement to writing will not prevent contract formation prior to execution (*T. Moriarty & Son v Case Contr.*, 287 AD2d 390 [2001], *lv withdrawn* 98 NY2d 670 [2002]; *Elizabeth St. v 217 Elizabeth St. Corp.*, 276 AD2d 295 [2000]).

The complaint adequately sets forth the requisite indicia of a joint venture based upon the *implied* agreement evidenced by the parties' conduct.

The indicia of the existence of a joint venture are: acts manifesting the intent of the parties to be associated as joint venturers, mutual contribution to the joint undertaking through a combination of property, financial resources, effort, skill or knowledge, a measure of joint proprietorship and control over the enterprise, and a provision for the sharing of profits and losses (*see Tilden of N.J. v Regency Leasing Sys.*, 230 AD2d 784, 785-786 [1996]; *Village of Wellsville v Village of Andover*, 231 AD2d 870 [1996]). As noted in *Mendelson v Feinman* (143 AD2d 76 [1988]), the intent of the parties, as one of the factors in determining whether a joint venture exists, may be express *or implied*. Giving plaintiffs the benefit of every favorable inference, such intent may be implied from the totality of the conduct alleged here.

Notably, although the motion court asserted that Elias was acting solely on behalf of one of his own companies when he submitted the bid for Gelco, the complaint alleges that Richbell was acting on behalf of the joint venture, based upon, and in reliance upon, Jupiter's and RIT's agreements to participate in it. Even where the parties acknowledge that they intend to hammer out details of an agreement subsequently, a preliminary agreement may be binding (*see Teachers Ins. & Annuity Assn. of Am. v Tribune Co.*, 670 F Supp 491, 498 [1987]); here, it is asserted that notwithstanding the intent to hammer out details subsequently, the parties agreed to the joint venture itself, with the essential understanding of what each party's contribution and potential exposure would be.

The intended joint control of the joint venture is sufficiently pleaded by the assertion that the coventurers each were given ownership or control of H-G stock; the joint contribution of property to the venture is supported by Richbell's contribution of Harpur and Elias's management skills, and Jupiter's contribution of $85 million in investment capital. Similarly, the agreement to share profits and losses was sufficiently alleged, since we reject defendants' contention that a joint venture requires an *equal* sharing.

To require complete equality among members of a joint venture with respect to each of its required elements would be taking a significant legal step backward by depriving this business form of its raison d'étre, i.e., flexibility as partnership for a limited purpose (*see Gramercy Equities Corp. v Dumont*, 72 NY2d 560, 565 [1988]). This would contravene the nature of the original model, since even partners may be contractually entitled to receive different shares of profits and

to suffer losses in different proportions, and would have the effect of falling out of step with new business structures that may be developing faster than the common law can keep up with them.

Thus, while Jupiter maintains that it was cushioned through the share structure from the full effect of losses, so that, in the words of the motion court, there was a "lack of commonality of interest," this does not mean that there was no possibility of its taking a loss or that it did not agree to do so. There is no merit to its position that the interests of the joint venturers are required to be "sufficiently aligned" to impose a fiduciary relationship.

Indeed, the Court of Appeals' use of the phrase "community of interest" 45 years ago in the leading case of *Matter of Steinbeck v Gerosa* (4 NY2d 302 [1958], *appeal dismissed* 358 US 39 [1958]), where it stated that "community of interest" alone does not create a joint venture, merely referred to common economic objective, purpose or motive (*see id.* at 317); it does not support a rule that a joint venture cannot be established in the absence of a "commonality of interest."

Similarly, it is not required that each joint venturer actually exercise the same degree of management control. While Elias was the day-to-day manager, this does not mean plaintiffs had total management control; this was particularly so after the parties decided to operate the joint venture through H-G, in which control was vested in a board on which each side held seats. The inquiry as to the existence of this factor is limited to whether a member of the venture had *any* measure of control (*see e.g. De Vito v Pokoik*, 150 AD2d 331 [1989]).

*Did Formation of the Corporation End the Joint Venture?*

Jupiter contends that, assuming, arguendo, a joint venture existed prior to the Gelco closing, it necessarily terminated upon the formation of H-G. We disagree.

While case law exists standing for the proposition that a joint venture ceases to exist when the parties form a corporation to carry out one or more of its objectives (*see Sagamore Corp. v Diamond W. Energy Corp.*, 806 F2d 373 [1986]), the language in *Sagamore* that the parties must have "reserved" certain rights, inter se, in order for the joint venture to continue to exist, appears unnecessarily restrictive, serving no prophylactic or remedial purpose. We view as a better approach that of the Third Department in *Blank v Blank* (222 AD2d 851, 853 [1995]), which noted the lack of "a compelling reason to

preclude individuals from acting as partners between themselves and as a corporation to the rest of the world" where the rights of third parties, such as creditors, are not involved, and the parties' rights under the partnership agreement (here, the joint venture) are "not in conflict" with the corporation's functioning. We conclude that the reasonable rule is to make the governing concern whether the parties' rights as joint venturers are in conflict with the corporation's functioning, rather than whether they expressly provided for a reservation of rights in the corporate governance documents. In applying the *Blank* formulation, we note that Jupiter has not pointed to any conflict between the joint venture and the functioning of H-G.

*Fiduciary Duties as Shareholder of Closely Held Corporation*

Although we find sufficient basis to permit plaintiffs to plead that Jupiter has fiduciary obligations as a joint venturer, we address in the alternative the claim that Jupiter also owed plaintiffs fiduciary duties in its capacity as a shareholder in the closely held H-G. We conclude that sufficient facts have been alleged to hold Jupiter to fiduciary obligations in this respect as well.

A majority shareholder in a close corporation is in a fiduciary relationship with the minority (*see Barbour v Knecht*, 296 AD2d 218, 227 [2002]). Under the stockholder agreement, Jupiter was denominated the "Majority Holder" of H-G and had control over many corporate decisions, even though it did not hold the greatest percentage of shares and had the right to appoint only two of the seven board members. While one may question whether the agreement's use of the term "Majority Holder" makes Jupiter a majority shareholder within the meaning of the New York law of close corporations, Jupiter assumes that it is a majority shareholder for such purpose, although it maintains that fiduciary obligations do not arise unless the shareholders are in a truly close relationship, which, it asserts, is not the case here. It relies upon *Rosiny v Schmidt* (185 AD2d 727 [1992], *lv denied* 80 NY2d 762 [1992]), in which it was held that one shareholder was not required to explain a provision of a shareholders' agreement to another.

But this argument misrepresents the holding in *Rosiny*. Although this Court stressed there that the corporation's type of business did not involve a close working relationship among the shareholders, the holding was *not* that there was no fiduciary relationship, but, rather, that the *parameters* of the resulting duty did not require a shareholder to explain the agreement's buyout provision to another.

We also reject Jupiter's contention that the propriety of its conduct under the stockholder agreement is governed by Delaware law because H-G was a Delaware corporation and issues of corporate governance are determined by the state in which the corporation is chartered (*see Wilson v Tully*, 243 AD2d 229, 232 [1998]).

In contrast to the line of cases upon which Jupiter relies, plaintiffs are not claiming they had certain rights under the shareholder agreement and are not seeking relief relating to the governance of H-G. For example, in *Hart v General Motors Corp.* (129 AD2d 179 [1987], *lv denied* 70 NY2d 608 [1987]), the issue was whether the law of a foreign state should apply to the threshold issue of the requirement of a demand on the board of directors for a derivative suit (*see also Teachers' Retirement Sys. of La. v Welch*, 244 AD2d 231, 232 [1997]; *Wilson v Tully*, supra; *Miller v Schreyer*, 200 AD2d 492, 494 [1994]). In *Sturman v Singer* (213 AD2d 324 [1995]), the issue was whether corporate investment and hiring decisions were breaches of fiduciary duty. In all of the foregoing, the foreign jurisdiction had the greater interest in a matter of corporate governance; moreover, in several of the cases, there were already one or more actions pending on the very same issue in the foreign jurisdiction.

Here, however, there is no issue with respect to the corporate governance of H-G. The issues regarding Jupiter's alleged misconduct relate to its alleged abuse of rights, in which the fact that a corporate entity was involved was only incidental; there is no legal question as to the meaning of a corporate document, the parties' express rights thereunder or what the corporation qua corporation may or may not do. Thus, Delaware law should not govern the issue here.

In any event, under Delaware law as well, a controlling shareholder owes a fiduciary duty to other shareholders (*see Ivanhoe Partners v Newmont Min. Corp.*, 535 A2d 1334, 1344 [Del 1987]). It is therefore of no moment that H-G may not have been, technically, a close corporation under Delaware law.

### Breach of Fiduciary Duty

Assuming arguendo there was a fiduciary relationship and resulting obligations, Jupiter questions whether there was any breach because it "had no duty to accommodate" plaintiffs as they faced financial difficulties by allowing them to proceed with an IPO. This argument relies upon the absence from the stockholder agreement of any explicit limitation on Jupiter's right to veto any IPO.

However, there are at least two flaws to this argument. First, the veto of the IPO is not the sole wrong alleged to be a breach; it is the entire course of conduct from the loan to the blockage of the IPO to the allegedly collusive "secret agreement" and low-ball foreclosure bid. Second, even where one has an apparently unlimited right under a contract, that right may not be exercised solely for personal gain in such a way as to deprive the other party of the fruits of the contract.

This limitation on an apparently unfettered contract right may be grounded either on the construction of the parties' fiduciary obligations (*see Wilf v Halpern*, 194 AD2d 508 [1993], *lv dismissed* 82 NY2d 846 [1993]; *Beck v Manufacturers Hanover Trust Co.*, 218 AD2d 1, 9-11 [1995]; *Drucker v Mige Assoc. II*, 225 AD2d 427, 428 [1996], *lv denied* 88 NY2d 807 [1996]) or on the purely contractual rule that even an explicitly discretionary contract right may not be exercised in bad faith so as to frustrate the other party's right to the benefit under the agreement (*see Matter of Kaszirer v Kaszirer*, 298 AD2d 109, 110 [2002], citing *Dalton v Educational Testing Serv.*, 87 NY2d 384, 389 [1995]; *1-10 Indus. Assoc. v Trim Corp. of Am.*, 297 AD2d 630, 631-632 [2002]).

Jupiter urges the rigorous application of the rule in *Murphy v American Home Prods. Corp.* (58 NY2d 293, 304 [1983]), that the implied covenant of good faith cannot create new duties that negate explicit rights under a contract (*see also D & L Holdings v RCG Goldman Co.*, 287 AD2d 65, 73 [2001], *lv denied* 97 NY2d 611 [2002]; *Rick Consulting Corp. v Associated Food Stores*, 290 AD2d 388 [2002]; *Sheth v New York Life Ins. Co.*, 273 AD2d 72, 73 [2000]; *Mark Patterson, Inc. v Bowie*, 237 AD2d 184, 186 [1997]). We recognize that there is clearly some tension between, on the one hand, the imposition of a good faith limitation on the exercise of a contract right and, on the other, the avoidance of using the implied covenant of good faith to create new duties that negate explicit rights under a contract. However, the allegations here clearly go beyond claiming only that Jupiter should be precluded from exercising a contractual right; they support a claim that Jupiter exercised a right malevolently, for its own gain as part of a purposeful scheme designed to deprive plaintiffs of the benefits of the joint venture and of the value of their pre-existing holdings in Harpur. These allegations do not create new duties that negate Jupiter's explicit rights under a contract, but rather, seek imposition of an entirely proper duty to eschew this type of bad faith targeted malevolence in the guise of business dealings.

*Implied Covenant of Good Faith*

As previously discussed, because it is alleged that Jupiter invoked its veto power over the IPO for an illegitimate purpose and in bad faith, the third cause of action, alleging bad faith breach of the H-G stockholder agreement based on this allegation, is viable.

Whether the bad motive imputed to Jupiter was its actual motive is an issue of intent generally left to the trier of fact (*see Matter of Kaszirer v Kaszirer*, 298 AD2d 109, *supra* [2002]; *Merzon v Lefkowitz*, 289 AD2d 142, 143 [2001]). We note, however, the lack of merit to plaintiffs' argument that a claim for breach of implied obligations can never be dismissed at the pleadings stage. Indeed, *Steinhardt Group v Citicorp* (272 AD2d 255 [2000]), cited by plaintiffs for this proposition, is precisely to the contrary: it dismissed such a claim (*id.* at 257). On the other hand, summary judgment finding liability for breach of the implied covenant of good faith has been granted on a search of the record on appeal (*9 Bros. Bldg. Supply Corp. v Buonamicia*, 299 AD2d 529 [2002]).

*Breach of Agreement to Use "Best Efforts" to Launch IPO*

Supreme Court correctly dismissed plaintiffs' claim that Jupiter and RIT breached an April 1996 agreement by failing to use their best efforts to launch an IPO: it was a mere agreement to agree, intent to be bound was not adequately pleaded, and the terms of the alleged agreement were too vague to be enforced.

Clearly, the April 18 "memo of understanding" contains nonbinding-type language in that the issues were only "agreed to in principle" and several points are phrased as proposals that depended on obtaining concessions from Elias. Moreover, the material terms of the IPO were not set forth; the document was no more than a status report.

The alleged part performance, in that the $30 million loan to Richbell was made under the identical terms set forth in the memo, is not evidence of an intent to be bound by the memo and did not cure any indefiniteness, since such performance of that portion of the memo is not unequivocally referable to the alleged obligation to go forward with an IPO that plaintiffs seek to enforce.

The memo itself does not use the phrase "best efforts." Plaintiffs seek to engraft the obligation to use "best efforts" onto Jupiter's alleged agreement to bring about an IPO based upon Griffiths's alleged oral assurances to Elias. This cannot

impose the obligation on Jupiter because Jupiter itself was not a party to the memo and there are no factual allegations to show that it was Griffiths's principal with respect to his alleged oral assurances; the allegation that he made the assurances as Jupiter's "agent" is purely conclusory. Thus, even assuming, arguendo, "best efforts" were a sufficiently definite and enforceable standard in this case, measurable against some clear set of guidelines (*see Non-Linear Trading Co. v Braddis Assoc.*, 243 AD2d 107, 113 [1998]; *Bernstein v Felske*, 143 AD2d 863, 865 [1988]), there was no definite agreement to proceed toward an IPO.

Thus, the combination of the memo and the oral assurances does not raise a question of fact as to whether plaintiffs and Jupiter reached an agreement or a binding preliminary agreement giving rise to a duty to negotiate in good faith (*compare SNC, Ltd. v Kamine Eng'g & Mech. Contr. Co.*, 238 AD2d 146 [1997]).

*Promissory Estoppel*

Nor, as the motion court correctly determined, did plaintiffs adequately allege they reasonably relied on the alleged promise to proceed with an IPO. The alleged promise, based on the terms of the alleged April 1996 agreement, was too indefinite to be the type of clear and unambiguous promise required for promissory estoppel (*see Tsabbar v Auld*, 289 AD2d 115 [2001], *lv denied* 98 NY2d 613 [2002]; *Pullman Group v Prudential Ins. Co.*, 288 AD2d 2, 4 [2001], *lv denied* 98 NY2d 602 [2002]). Nor was plaintiffs' conduct in borrowing the $30 million unequivocally referable to the alleged promise to do an IPO or to use best efforts to have another party do it (*see O'Reilly v NYNEX Corp.*, 262 AD2d 207, 208 [1999]).

*RIT Breach of Separate Agreements*

Supreme Court correctly dismissed the claim that, on April 21 when RIT director Griffiths reviewed the April 18 memo of understanding with Elias and allegedly pledged his "best efforts" to ensure that Jupiter would comply with its promises, his assurances as to each item in the memo constituted a separately enforceable oral contract. This claim merely restates the inadequate claim for breach of the memo of understanding.

However, contrary to Jupiter's contention, it was not impossible for RIT to perform. It was not necessary for RIT to control Jupiter in order for RIT to use its best efforts to attempt to get Jupiter to proceed with the IPO; an attempt was all that was called for, not coercion, and certainly persuasion was within RIT's ken.

*Breach of the AGIT Note*

The motion court properly dismissed plaintiffs' claim that RIT and AGIT breached the terms of the $30 million promissory note because the note was predicated on the implied understanding and covenant of good faith to work toward the IPO. This claim amounts to a mere rehashing of plaintiffs' inadequate claims for breach of the April 1996 memo of understanding.

In any event, Richbell's inability to pay the note was not rendered impossible (*see Kel Kim Corp. v Central Mkts.*, 70 NY2d 900, 902 [1987]; *LeRoy v Sayers*, 217 AD2d 63, 71 [1995]). Nor was such inability to pay a direct consequence of the failure to bring an IPO to the extent that it can be said Jupiter frustrated Richbell's performance of its obligation to pay the note. The obligation under the note was not linked, by express condition precedent or otherwise, to an IPO (*compare generally A.H.A. Gen. Constr. v New York City Hous. Auth.*, 92 NY2d 20, 31 [1998]).

*Fraud*

The motion court correctly dismissed the twelfth cause of action for fraud, because reliance on the contingent future event of an IPO was not reasonable, the representation was inconsistent with specific recitals in the stockholder agreement, and there was a merger clause disclaiming reliance on extrinsic representations.

Moreover, while a false statement of intention can be sufficient to support a claim of fraud (*see Graubard Mollen Dannett & Horowitz v Moskovitz*, 86 NY2d 112, 122 [1995]), the fraud alleged here is based on the same facts underlying the contract claim and merely duplicated it (*see Cinque v Schieferstein*, 292 AD2d 197 [2002]; *New York Health & Racquet Club v NIA/Kornreich LLC*, 290 AD2d 348, 349 [2002]; *Coppola v Applied Elec. Corp.*, 288 AD2d 41, 42 [2001]). And, although a fraud claim may be dismissed *as duplicative* only as against a defendant against whom the related contract claim is viable (*see Bronx Store Equip. Co. v Westbury Brooklyn Assoc.*, 280 AD2d 352 [2001]), the fraud claim was properly dismissed as to all the defendants, including those who were not parties to the AGIT note, since in any event their alleged fraud liability was essentially accessorial only, so that once the main fraud claim against the direct actor falls, so does the claim against the remaining defendants.

*Breach of Duties as Secured Creditors*

Plaintiffs alleged that the planned collusive foreclosure violated Richbell's rights as pledgor of the collateral because the secured creditors are statutorily mandated to dispose of the collateral in a "commercially reasonable" manner. Supreme Court dismissed this claim as both duplicative of the other claims and premature.

Certainly it was premature. While the wrong may be based on events that take place prior to the disposition of the collateral, the cause of action is not ripe for adjudication until the wronged party is injured. Here, plaintiffs concede they are referring to a *future* foreclosure sale; it is undisputed that none has taken place. Notably, no injunctive relief or other provisional relief is sought in this context.

*Conversion*

Richbell's twenty-third cause of action, for conversion, while satisfying the technical elements of that tort (*see Imprimis Invs. v Insight Venture Mgt.*, 300 AD2d 109, 110 [2002]; *Republic of Haiti v Duvalier*, 211 AD2d 379, 384 [1995]), was properly dismissed as duplicative of the insufficient contract claims (*see Retty Fin. v Morgan Stanley Dean Witter & Co.*, 293 AD2d 341 [2002]; *Wolf v National Council of Young Israel*, 264 AD2d 416, 417 [1999]; *Sutton Park Dev. Corp. Trading Co. v Guerin & Guerin Agency*, 297 AD2d 430, 432 [2002]). We are not persuaded by Richbell's argument that conversion is a wrong qualitatively different from a mere breach of contract, so that it is not duplicative; such reasoning would resuscitate every redundant tort claim, regardless of its theory.

*Elias's Claim for Fraudulent Inducement*

The motion court properly dismissed Elias's claims for fraudulent inducement of the stockholders agreement, the Northington note (fifth cause of action) and the AGIT note (twelfth cause of action), because he was not, individually, a party to any of those documents. While the corporate veil may be pierced for the benefit of those suing a corporation, it will not be pierced in the reverse manner for the benefit of the corporation or its individual shareholders (*see Uribe v Merchants Bank of N.Y.*, 239 AD2d 128 [1997], *affd* 91 NY2d 336 [1998]). Northington and RIS were parties, not Elias.

Elias's conclusory allegation that he was an intended beneficiary of the corporate agreements (*see Bogan v Northwestern Mut. Life Ins. Co.*, 292 AD2d 411, 412 [2002], *lv denied* 99 NY2d 545 [2002]), must be rejected in light of his repeated denial on appeal that he was a party to the documents. In any

event, neither the language in any of the documents nor any allegations regarding the surrounding circumstances support his claim that he was an intended beneficiary (*see Burton v Millrock Owners Corp.*, 283 AD2d 186 [2001]; *First Capital Asset Mgt. v N.A. Partners*, 260 AD2d 179, 180-181 [1999], *lv denied* 93 NY2d 817 [1999]).

Elias's present attempt to reconfigure his claims by asserting that he was induced to take "certain actions to his detriment" other than entering into the agreements should not revive them.

*Jurisdiction Over AGIT*

Defendant AGIT, a British domiciliary, moved to dismiss on the grounds asserted by the other defendants as well as for, inter alia, lack of personal jurisdiction. In support of the jurisdiction argument, AGIT submitted the affidavit of a director, Duncan Budge, who averred that he was a director of both AGIT and RIT located at the same London address; that AGIT did not have any office, phone listing, mailing address, bank account, authorized agent, subsidiary or employee in New York; that it did not own any real property in New York; that it did not have authority to do business in New York; and that it never litigated in New York, other than this action.

He further averred that AGIT and RIT are separate companies, and he was the only director they had in common. He denied that either was agent of the other.

Budge also averred that Paul Griffiths had been the RIT employee with primary responsibility for monitoring the investment in H-G; in February 1997, Budge took over this responsibility. Budge denied traveling to New York in any connection since that time.

Paul Griffiths also submitted an affidavit in support of jurisdictional dismissal, averring that he had been employed by RIT, but never by AGIT. He, too, denied that the two entities were each other's agents.

Griffiths described his contacts with New York: From 1995-1997, he traveled to New York *on behalf of RIT* a number of times with regard to the H-G investment, but on no occasion as a representative of AGIT. Once, he was in New York to discuss with Jupiter documentation of the Richbell loan, but most of the discussions were by telephone from England. Griffiths admitted he had signed the loan agreement on behalf of AGIT (in England), but this was the *only* time he was ever authorized to act on its behalf.

The motion court ruled that, even if it had not dismissed the complaint in its entirety, it would dismiss as against AGIT for lack of personal jurisdiction because the subject note was made in England and AGIT's allegedly wrongful conduct took place there. AGIT's submission to New York jurisdiction pursuant to the January 1997 agreement was found to not amount to a broad submission to New York jurisdiction for all purposes, including the instant litigation. RIT's acts in New York did not submit AGIT to New York jurisdiction because the two entities are separate. Finally, Griffiths's visit to New York did not confer jurisdiction over AGIT because, even if he was AGIT's agent in one instance, the presence of an agent does not confer jurisdiction over the principal when the agent is not conducting the business of the principal.

This determination was correct. Jurisdiction over AGIT was predicated solely on CPLR 302 "transaction" of business or long arm jurisdiction for commission of a tort in this state, not for "doing business" under CPLR 301. However, there was no purposeful activity alleged as to AGIT establishing a substantial nexus between the business transacted and the cause of action (*see Liberatore v Calvino*, 293 AD2d 217, 220 [2002]). There was no showing, or allegations leading to the inference, that RIT's presence in New York conferred jurisdiction over AGIT (*see Libra Global Tech. Servs. [UK] v Telemedia Intl.*, 279 AD2d 326; *Bank of Tokyo-Mitsubishi v Kvaerner a.s.*, 243 AD2d 1, 6 [1998]), and a showing of agency for jurisdictional purposes will not be inferred from the mere existence of a parent-subsidiary relationship (*Edelman v Taittinger, S.A.*, 298 AD2d 301 [2002]).

While Griffiths was an agent of AGIT on one occasion when he signed the note on its behalf in England, it is not alleged that he performed any acts in New York that give rise to any of the claims against AGIT. For "transaction of business" there must be a substantial relationship between the transaction and the claim asserted (*Kreutter v McFadden Oil Corp.*, 71 NY2d 460, 467 [1988]).

*Plaintiffs' Appeal as to Defendants H-G and Harpur*

Although plaintiffs are technically pursuing this appeal with respect to their dismissed claims against H-G, their briefs are silent with respect to this defendant. Under the circumstances, the appeal is dismissed as abandoned with respect to the causes of action asserted against H-G (*see Matter of East Harlem Bus. & Residence Alliance v Empire State Dev. Corp.*, 273 AD2d 33, 34 [2000]).

However, even if the technical continuation of such appeal were to amount to frivolous conduct, we would deny H-G's request for sanctions in the exercise of discretion.

Accordingly, the judgment of the Supreme Court, New York County (Karla Moskowitz, J.), entered March 15, 2002, which dismissed the action, bringing up for review an order, same court and Justice, entered March 11, 2002, which granted defendants' motions to dismiss the complaint, should be modified, on the law, to the extent of reinstating the first and second causes of action, for breach of fiduciary duty, and the third cause of action, for breach of contract, except as against defendant H-G Holdings, Inc., and otherwise affirmed, without costs. Plaintiffs' appeal as against H-G should be dismissed, without costs.

TOM, J.P., ROSENBERGER, LERNER and MARLOW, JJ., concur.

Judgment, Supreme Court, New York County, entered March 15, 2002, modified, on the law, to the extent of reinstating the first, second and third causes of action, except as against defendant H-G Holdings, Inc., and otherwise affirmed, without costs. Plaintiffs' appeal as against H-G Holdings, Inc., dismissed, without costs.