**TRIANCO, LLC, Appellant**

v.

**INTERNATIONAL BUSINESS MACHINES CORPORATION,** Appellee.

No. 07–1095.

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit L.A.R. 34.1(a) March 10, 2008.

Opinion Filed: April 2, 2008.

Timothy C. Russell, Paul R. Rosen, Richard D. Gallucci, Jr., Spector, Gadon & Rosen, Philadelphia, PA, for Appellant.

Robert N. Feltoon, Conrad, O'Brien, Gellman & Rohn, Philadelphia, PA, for Appellee.

Before: FUENTES, CHAGARES, and ALDISERT, Circuit Judges.

## OPINION

FUENTES, Circuit Judge:

Presently before the Court is Trianco, LLC's ("Trianco") appeal of the dismissal of its complaint against International Business Machine Corporation ("IBM") under Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the following reasons, we will affirm in part, vacate in part, and remand with instructions.

### I.

In early 2005, the federal Defense Commissary Agency (the "Government") issued a "request for proposal" ("RFP") seeking bids for a prime contract to install computerized "point-of-sale" checkstand equip-

ment at the approximately 280 military commissaries located in the United States and abroad. IBM, which possessed no prior experience in performing point-of-sale work at military commissaries, wished to submit a bid proposal as a potential prime contractor. IBM sought out Trianco, which possessed considerable experience in performing point-of-sale work, as a "team member" to prepare the bid.

In May 2005, IBM and Trianco entered into a "Teaming Agreement." Under the Teaming Agreement, IBM was obligated to prepare the bid proposal for the prime contract. Trianco, in turn, was obligated to submit to IBM, prior to submission of the bid proposal, its "cost/price" and "technical" proposals for the subcontract work. The Teaming Agreement further required Trianco to assist in drafting the bid proposal. In addition, the Teaming Agreement required Trianco to collaborate exclusively with IBM.

The crux of the present litigation is whether the Teaming Agreement required IBM to grant Trianco the subcontract, or whether IBM could grant the subcontract to a more affordable third party. A few provisions of the Teaming Agreement are relevant to our discussion. Several sections support Trianco's position, including Section 1.3 of the Teaming Agreement, which provides that "[u]pon award to IBM of a prime contract for the [Project], IBM will award a subcontract to [Trianco]." (App. 121.) Next, Section 5.0 of a document entitled "Scope of Work," which was attached to the Teaming Agreement, provides that "[s]ubject to successful contract award from [the Government], IBM shall offer Trianco a Subcontract to support IBM by providing resources to perform under the contract." (App. 124.) Section 5.0 of the Scope of Work also states that "[i]f Trianco offers competitive pricing, availability of competent resources, and an acceptable plan/strategy to perform the work in these areas, Trianco will have the right of first refusal to perform the work." (App. 125.)

However, other sections of the Teaming Agreement support IBM's position that, if the Government awarded IBM the prime contract, IBM and Trianco would then negotiate the terms of a subcontract and, if such negotiations were unfruitful, IBM could award the subcontract to another party. For instance, Section 1.4 of the Teaming Agreement provides that "[a]fter the successful award of a contract to IBM, the parties will in good faith negotiate mutually acceptable terms and conditions of the subcontract." (App. 121.) Furthermore, Section 5.1(f) of the Teaming Agreement provides that the agreement would terminate if "[t]he parties fail to negotiate and execute a subcontract agreement containing mutually satisfactory prices and terms within a reasonable period after the award of the prime contract to IBM." (App. 122.) Moreover, Section 5.0 of the Scope of Work states that "Trianco's support/participation is subject to the ability of the parties to negotiate mutually acceptable terms and conditions and Trianco offering competitive pricing." (App. 125.)

In the spring and summer of 2005, Trianco began preparing the technical plans and proposals responsive to the RFP. Trianco's work-product contained proprietary business information and reflected its years of experience working on similar proposals. In July 2005, Trianco submitted the proposal, which IBM used to prepare its bid for the prime contract. In addition, Trianco submitted a proposal to IBM for the pricing of the subcontract work. According to Trianco, IBM's bid proposal, which it submitted to the Government, confirmed that Trianco's pricing proposal was "competitive" and "acceptable." (App. 102.)

The Government awarded IBM the prime contract on December 30, 2005. On

December 31, 2005, IBM advised Trianco that its pricing proposals for the subcontract work were unacceptable and not competitive. IBM then asked Trianco to "rebid" its initial pricing. (App. 106.) Trianco submitted a new bid "under protest," which IBM rejected. (App. 107.) IBM then revealed that it had solicited an alternative bid for the subcontract work from a third party.

Trianco then filed suit in the United States District Court for the Eastern District of Pennsylvania. Trianco alleged that IBM breached its fiduciary duty to Trianco and the implied covenant of good faith and fair dealing. Trianco also asserted claims of unjust enrichment, equitable estoppel, and promissory estoppel. IBM then moved to dismiss Trianco's complaint under Federal Rule of Civil Procedure 12(b)(6). On December 21, 2006, the District Court granted IBM's motion and dismissed the complaint in its entirety. *See Trianco LLC v. Int'l Bus. Mach. Corp.,* 466 F.Supp.2d 600 (E.D.Pa.2006). Trianco now appeals.

## II.

We have jurisdiction to review this matter under 12 U.S.C. § 1291. We will review the District Court's dismissal of Trianco's complaint *de novo. Edgar v. Avaya, Inc.,* 503 F.3d 340, 344 (3d Cir.2007). When reviewing the grant of a motion to dismiss, we must accept as true all factual allegations asserted in the complaint and draw all reasonable inferences in favor of Trianco. *Lum v. Bank of Am.,* 361 F.3d 217, 223 (3d Cir.2004). In assessing the sufficiency of Trianco's allegations, we may consider the various documents referenced in the complaint, such as the Teaming Agreement and Scope of Work. *See Winer*

Family Trust v. Queen, 503 F.3d 319, 327 (3d Cir.2007). Furthermore, neither party disputes that this matter is governed by New York law.[1]

## III.

The first issue before us is whether Trianco's complaint states a claim for breach of contract. The District Court dismissed Trianco's breach of contract claim because the Teaming Agreement, it held, was missing an essential term— namely, Trianco's price for performing the subcontract. According to the District Court, the Teaming Agreement left the award of the subcontract contingent on future negotiations, and thus, the Teaming Agreement did not require IBM to grant Trianco the subcontract. *Trianco,* 466 F.Supp.2d at 606.

It is well-settled under New York law that a contract provision may be rendered an unenforceable "agreement to agree" if the parties left a material term for future negotiations. *See Joseph Martin, Jr. Delicatessen, Inc. v. Schumacher,* 52 N.Y.2d 105, 109, 436 N.Y.S.2d 247, 417 N.E.2d 541 (1981). However, "where it is clear from the language of an agreement that the parties intended to be bound and there exists an objective method for supplying a missing term, the court should endeavor to hold the parties to their bargain." *166 Mamaroneck Ave. Corp. v. 151 East Post Rd. Corp.,* 78 N.Y.2d 88, 91, 571 N.Y.S.2d 686, 575 N.E.2d 104 (1991). *Martin Delicatessen* sets forth two ways the "objective method" can be identified: (1) where, within the four corners of the agreement, there exists a methodology for ascertaining the missing term; or (2) where the agreement "invited recourse to an objective, intrinsic event, condition or standard on which the amount was made to depend." *Martin*

---

1. The Teaming Agreement contained a choice of law provision stating that New York law would govern its terms.

*Delicatessen,* 52 N.Y.2d at 110, 436 N.Y.S.2d 247, 417 N.E.2d 541.

We find that IBM's promise to grant Trianco a subcontract, subject to the parties' future agreement on its terms, conditions, and pricing, is merely an agreement to agree. As such, it is unenforceable under New York law. While the Teaming Agreement provided that Trianco "will" and "shall" be awarded a subcontract, a material term of that promise was missing—namely, the price that IBM would pay Trianco for performing the subcontract. The agreement also contains no method for determining this price. While the Teaming Agreement states that Trianco will have a right of first refusal to reject the subcontract if it submitted "competitive pricing," the Teaming Agreement also does not define the term "competitive" nor does it refer to any extrinsic method for determining whether Trianco's pricing was, in fact, "competitive."

We are also not persuaded by Trianco's assertion that IBM accepted its pricing as competitive when it submitted its bid to the Government. Nothing in the Teaming Agreement states that Trianco's proposed pricing, when submitted by IBM to the Government, would constitute a definitive or even an approximate basis for determining Trianco's price.[2] Again, while the doctrine of definiteness is not a rigid concept, there must be some objective method for supplying a missing material term. *See, e.g., Clifford R. Gray, Inc. v. Le Chase Constr. Servs., LLC,* 31 A.D.3d 983, 819

N.Y.S.2d 182 (2006) (holding that a subcontractor's pricing proposals submitted to the prime contractor to secure a bid did not, without more, supply the missing term of the subcontractor's pricing). No such method existed here. Accordingly, we agree with the District Court that the Teaming Agreement, as it relates to Trianco's right to receive the subcontract, is unenforceable as a matter of law. Thus, because Trianco had no contractual right to receive the subcontract, the District Court correctly dismissed Trianco's claim for breach of contract.

## IV.

■ Next, we consider Trianco's unjust enrichment claim. Unjust enrichment is a "quasi-contract claim" and "is an obligation the law creates in the absence of any agreement." *Goldman v. Metro. Life Ins. Co.,* 5 N.Y.3d 561, 572, 807 N.Y.S.2d 583, 841 N.E.2d 742 (2005). The elements of an unjust enrichment claim are: (1) the defendant was enriched; (2) at the expense of the plaintiff; and (3) it would be inequitable to permit the defendant to retain that which is claimed by the plaintiff. *Cruz v. McAneney,* 31 A.D.3d 54, 59, 816 N.Y.S.2d 486 (2006) (quotations omitted). The District Court dismissed Trianco's unjust enrichment claim on the ground that the Teaming Agreement was enforceable and thus precluded the unjust enrichment claim. *Trianco,* 466 F.Supp.2d at 609. However, the District Court did not analyze whether the Teaming Agreement was, in fact, enforceable in its entirety.[3]

---

**2.** We note that Section 1.2(e) of the Teaming Agreement states that Trianco's pricing proposal would constitute the maximum it could be paid if a subcontracting agreement was reached. (App. 121.) This provision falls well short, though, of constituting an objective pricing mechanism. All this provision created was a price ceiling which Trianco could charge IBM. It did not provide any range or method for determining when a price would

be considered "competitive" under the Teaming Agreement.

**3.** The District Court did hold that "[t]he Teaming Agreement was an enforceable contract to the extent that it bound the parties to negotiate for a subcontract price in good faith after the award of the prime bid." *Trianco,* 466 F.Supp.2d at 609. This holding, though, appears to contradict the District Court's earlier comment that "The question of whether

Above we found that the Teaming Agreement did not bind IBM to grant Trianco the subcontract. However, Section 12.0 of the Teaming Agreement contains a severability clause providing that the unenforceability of any of its provisions does not render the remainder of the agreement unenforceable. (App. 123.) Thus, our holding that IBM's promise to award Trianco a subcontract is unenforceable does not require us to find the remainder of the Teaming Agreement to be unenforceable. The promise of each party to a bilateral agreement, such as the Teaming Agreement, must be supported by valuable consideration. *See, e.g., Curtis Props. Corp. v. Greif Cos.*, 212 A.D.2d 259, 264, 628 N.Y.S.2d 628 (1995) (citing Calamari and Perillo, Contracts § 70, at 134). As such, a promise obliging only one party to a contract to do something, without receiving any benefit in return, is illusory and creates no enforceable obligation. *Id.*

Here, the Teaming Agreement required Trianco to provide IBM with its proprietary information and industry expertise to assist in preparing the bid. However, without receiving a guaranteed subcontract in return, it appears that Trianco may not have received consideration.

Accordingly, we will remand this matter to the District Court for a determination as to whether the remainder of the Teaming Agreement was valid and, if so, whether Trianco's complaint states a cause of action for unjust enrichment.

## V.

Next, Trianco challenges the District Court's dismissal of its breach of fiduciary duty claim. The District Court rejected this claim because the allegations in Trianco's complaint described an "arms-

length" transaction between two parties possessing considerable industry experience. *Trianco*, 466 F.Supp.2d at 608. The District Court also held that IBM did not breach its fiduciary duty by awarding the subcontract to a third party because it was merely exercising its rights under the Teaming Agreement. *See id.* at 608–609.

Trianco argues that the District Court erred because IBM's "dominant position" in their relationship, and IBM's representations and assurances, created a "special relationship of trust and confidence" that IBM breached by not awarding the subcontract to Trianco. (App 111.) Trianco also argues that IBM breached its fiduciary duty when it secretly sought cheaper bids on the subcontract, and by using Trianco's proprietary business information and industry credentials contrary to Trianco's best interests.

To determine whether a fiduciary relationship exists, "New York law inquires whether one person has reposed trust or confidence in the integrity and fidelity of another who thereby gains a resulting superiority or influence over the first." *Teachers Ins. & Annuity Assoc. of Am. v. Wometco Ent., Inc.*, 833 F.Supp. 344, 349–50 (S.D.N.Y.1993). Accordingly, a fiduciary duty exists where one assumes control and responsibility over another, or where one has a duty, created by his undertaking, to act primarily for the benefit of another in matters connected with his undertaking. *See id.; see also Mandelblatt v. Devon Stores, Inc.*, 132 A.D.2d 162, 168, 521 N.Y.S.2d 672 (1987). Fiduciary relationships, though, typically do not arise between parties engaging in arms length business transactions. *See EBC I, Inc. v. Goldman Sachs & Co.*, 5 N.Y.3d 11, 22, 799

---

the bid-preparation phase obligations of the Teaming Agreement are all enforceable—for example, Trianco's exclusivity agreement—is not reached by this case." *Trianco*, 466

F.Supp.2d at 607 n. 3. Regardless, as discussed below, the District Court did not discuss whether valid consideration existed for the Teaming Agreement.

N.Y.S.2d 170, 832 N.E.2d 26 (2005); *SNS Bank, N.V. v. Citibank, N.A.*, 7 A.D.3d 352, 355, 777 N.Y.S.2d 62 (2004). Absent an allegation of a special relationship, mere assertions of "trust" in one party are insufficient to support a claim of fiduciary relationship. *See Freedman v. Pearlman*, 271 A.D.2d 301, 305, 706 N.Y.S.2d 405 (2000).

We agree with the District Court that this claim was appropriate for dismissal. As the District Court correctly ruled, Trianco's complaint merely reflects an arms length commercial transaction between two experienced business entities. *See Abercrombie v. Andrew Coll.*, 438 F.Supp.2d 243, 274 (S.D.N.Y.2006) (though claims alleging the existence of a fiduciary duty are not normally appropriate for dismissal at the 12(b)(6) stage, "absent an allegation of a special relationship, mere assertions of trust and confidence are insufficient to support a claim of a fiduciary relationship.") (quotations omitted); *SNS Bank, N.V.*, 7 A.D.3d at 355, 777 N.Y.S.2d 62 (affirming dismissal of breach of fiduciary duty claims where "the parties merely had an arm's length business relationship."). In fact, Trianco concedes in its complaint that it is an "experienced electrical services contractor" which has been the "sole [point-of-sale] site survey, site preparation and checkstand installation contractor (or subcontractor) for all military commissary installations" for the past 20 years. (App. 92.) While Trianco alleges that IBM held a "dominant position" in their relationship, Trianco does not allege that IBM possessed some "superior expertise or knowledge about some subject and misled plaintiff by false representations concerning that subject," thereby creating a fiduciary duty. *Talansky v. Schulman*, 2 A.D.3d 355, 360, 770 N.Y.S.2d 48 (2003) (quotations omitted).

## VI.

■ Next, Trianco challenges the District Court's dismissal of its claim that IBM breached the implied covenant of good faith and fair dealing. The District Court dismissed this claim because it was "based on and incorporates the same allegations that the breach of contract claim is based on: that IBM stopped Trianco from getting a subcontract." *Trianco*, 466 F.Supp.2d at 609. We agree. Under New York law, a claim for breach of the implied covenant of good faith and fair dealing must be separate from any breach of contract claim. *See Cerberus Int'l, Ltd. v. BancTec, Inc.*, 16 A.D.3d 126, 127, 791 N.Y.S.2d 28 (2005) ("The claim for breach of the implied covenant of good faith and fair dealing was properly dismissed as duplicative of the contract claim."). Here, Trianco's allegations essentially duplicate the allegations in its breach of contract claim. Accordingly, dismissal was appropriate.

## VII.

■ Trianco also challenges the District Court's dismissal of its equitable estoppel claim. "Equitable estoppel is defined as '[t]he doctrine by which a person may be precluded by his act or conduct, or silence when it is his duty to speak, from asserting a right which he otherwise would have had.' " *Besicorp Group v. Enowitz*, 235 A.D.2d 761, 764, 652 N.Y.S.2d 366 (1997) (quoting Black's Law Dictionary 538 (6th ed. 1990)). To state a claim for equitable estoppel, a party must plead: (1) lack of knowledge of the true facts; (2) reasonable reliance on the conduct of the party estopped; and (3) a prejudicial change in its position. *Broadworth Realty Assoc. v. Chock 336 B'way Operating, Inc.*, 168 A.D.2d 299, 301, 562 N.Y.S.2d 630 (1990).

Even if IBM concealed its solicitation of a cheaper subcontractor, or failed to advise

Trianco that its pricing was not competitive, the Teaming Agreement nevertheless clearly stated that Trianco would only be awarded the subcontract if, after future negotiations, it was the cheapest bidder. As such, Trianco could not have reasonably relied on any alleged misrepresentation or concealment of fact by IBM that it its pricing was competitive, or that it was guaranteed the subcontract. Accordingly, we agree with the District Court that dismissal of this claim was appropriate.

## VIII.

 Finally, Trianco challenges the District Court's dismissal of its promissory estoppel claim. The District Court dismissed this claim because Trianco did not allege that IBM made an express promise to award it a subcontract at the prices Trianco proposed. We agree with this conclusion. To state a claim for promissory estoppel, the complaint must allege a "clear and unambiguous promise." *Richbell Info. Servs. v. Jupiter Partners, L.P.*, 309 A.D.2d 288, 304, 765 N.Y.S.2d 575 (2003). Here, Trianco's claim that IBM clearly and unambiguously promised Trianco a subcontract at a certain price is contradicted by the terms of the Teaming Agreement, which states in no uncertain terms that Trianco's receipt of a subcontract was subject to future negotiations on price. Accordingly, the District Court properly dismissed this claim.

## IX.

For the foregoing reasons, we will affirm in part and vacate in part.

---

* Honorable Joseph H. Rodriguez, Senior Judge of the United States District Court for the