**COSY GOOSE HELLAS, Aristotelis Diktopoulos, CHR Diktopoulos SA, Tsitsivas Bros., Plaintiffs,**

v.

**COSY GOOSE USA, LTD., Laurevan Shoe Corp., Paul Weitman, Defendants.**

No. 06 Civ. 4363(SCR)(LMS).

United States District Court, S.D. New York.

Oct. 3, 2008.

David Douglas Jensen, John C. Koster, Jack A. Greenbaum, Blank Rome LLP, New York, NY, for Plaintiffs.

Ronald Alan Sher, Marc Howard Fryburg, Himmelfarb & Sher, LLP, White Plains, NY, for Defendants.

## DECISION AND ORDER

LISA MARGARET SMITH, United States Magistrate Judge.

Plaintiffs Cosy Goose Hellas, Artistotelis Diktopoulos, CHR Diktopoulos SA, and Tsitsivas Bros. (herein, "Plaintiffs") and Defendants Paul Weitman and Laurevan Shoe Corp. (herein, "Defendants") have filed cross motions for summary judgment seeking a judicial determination as to

whether there exists a joint venture between two or more of the parties to this action. *See* Docket # 69, Defendants' Notice of Motion; Docket # 73, Plaintiffs' Notice of Motion. Defendants maintain that there exists no such joint venture and that the claims asserted by the Plaintiffs predicated upon the existence of such a fiduciary relationship should be dismissed; Plaintiffs maintain that such a fiduciary duty exists between the parties, that there is no genuine issue of material fact in dispute as to the formation and existence of the joint venture, and that the claims based upon the existence of the joint venture should proceed to trial. Separately, Defendant Cosy Goose USA, Ltd. (herein, "Cosy Goose USA"), which has not joined in the branch of the Defendants' motion challenging the existence of a joint venture, has moved for summary judgment in its favor on one of its counter-claims against Plaintiff Diktopoulos SA sounding in breach of warranty of merchantability, *see* Docket # 69, Defendants' Notice of Motion at ¶ 2 (seeking "partial summary judgment, on liability, on the First Counterclaim"), and Plaintiffs have moved for summary judgment in their favor on their alternative claim of unjust enrichment and restitution against the Defendants, *see* Docket # 73, Plaintiffs' Notice of Motion.

The parties have again consented to the jurisdiction of the undersigned for the limited purpose of rendering a decision on the instant dispositive motions pursuant to 28 U.S.C. § 636(c)(1).[1] *See* Docket # 72, Consent to United States Magistrate Judge for Dispositive Motion. For the following reasons Defendants Weitman and Laurevan's motion for summary judgment seeking dismissal of the joint venture allegations is granted, Plaintiffs' cross-motion for summary judgment seeking confirmation of a joint venture is denied, Defendant Cosy Goose USA's motion for summary judgment in its favor on its counterclaim sounding in breach of warranty is denied, and Plaintiffs' motion for summary judgment on their claim of unjust enrichment and restitution is denied without prejudice to renew within forty-five days of today's date.

## BACKGROUND

### A. Facts

The following facts are taken from the parties' recitations of undisputed material facts filed pursuant to Local Rule 56.1. *See* Docket # 69, Defendants' Notice of Motion, S.D.N.Y. Local Rule 56.1 Statement (herein, "Defs' 56.1 Statement"); Docket # 76, Plaintiffs' Rule 56.1 Statement (herein, "Pls' 56.1 Statement"). The following facts are undisputed and are assumed to be true for the purposes of these motions unless otherwise noted.

Defendant Paul Weitman is the president and sole shareholder of Defendant Laurevan Shoe Corporation, a closely held corporation organized under the laws of the State of New York. *See* Pls' 56.1 Statement at ¶¶ 18, 19. Mr. Weitman began Laurevan's business in 1985, which presently includes "import[ing], distribut[ing] and market[ing] shoes and other footwear, primarily in the United States ... through its network of approximately 1,000 shoe and footwear retailers...." *See* Docket # 69, Notice of Motion, Affidavit of Paul Weitman (herein, "Weitman Aff.") at ¶ 4. Among the shoes marketed and sold by Laurevan are "Eric Michael" brand shoes.

1. The parties previously consented to the jurisdiction of the undersigned for the purpose of rendering a decision on the Defendants' motions to dismiss. *See* Docket # 21. The undersigned issued a Decision and Order on March 2, 2007, granting in part and denying in part Defendants' motions to dismiss. *See* Docket # 28, Decision and Order (herein, "March 2nd Decision").

*See* Pls' 56.1 Statement at ¶ 20. "Eric Michael" brand shoes were originally manufactured by Plaintiff CHR Diktopoulos SA, a Greek corporation that is owned and operated by Plaintiff Aristotelis Diktopoulos and his family in Greece. *See* Pls' 56.1 Statement at ¶¶ 16, 20; Defs' 56.1 Statement at ¶ 1.[2] Mr. Weitman, through Laurevan, began purchasing "Eric Michael" shoes from Plaintiff Diktopoulos SA in 2000. *See* Pls' 56.1 Statement at ¶ 20; Defs' 56.1 Statement at ¶ 1.

In June of 2003 Mr. Diktopoulos and Mr. Weitman attended a trade show in Italy "where they discussed a possible business arrangement whereby Cosy Goose brand shoes manufactured by Diktopoulos SA would be imported and marketed in the United States." *See* Defs' 56.1 Statement at ¶ 4. The parties' discussion about their prospective business arrangement continued at Laurevan Shoe Corp.'s corporate offices in White Plains, New York later that month. *See* Defs' 56.1 Statement at ¶ 5. The business arrangement between Mr. Diktopoulos and Mr. Weitman envisioned Mr. Weitman organizing a new corporation, Cosy Goose USA, Ltd., "to import, distribute and market Cosy Goose brand shoes in the United States." *See* Defs' 56.1 Statement at ¶ 6. In furtherance of this agreement, Mr. Diktopoulos agreed to advance the money needed to start up the Cosy Goose USA business and to cover its initial expenses, *see* Defs' 56.1 Statement at ¶ 9, and Mr. Weitman agreed to run the daily operations of Cosy Goose USA, *see* Pls' 56.1 Statement at ¶ 48. The parties agreed that Mr. Weitman would receive an annual salary of $50,000 from Cosy Goose, USA, as compensation for overseeing and managing Cosy Goose USA, and that Laurevan would receive an eight percent commission on all Cosy Goose shoe sales. *See* Defs' 56.1 Statement at ¶¶ 7, 8. The agreement between the parties provided that Laurevan would receive commissions on all Cosy Goose shoe sales in exchange for Laurevan providing certain services and courtesies to Cosy Goose USA, including allowing Cosy Goose USA to operate out of Laurevan's business office, having Laurevan employees perform work for Cosy Goose USA, and marketing and selling the Cosy Goose brand shoes through Mr. Weitman and Laurevan's network of shoe retailers. *See* Pls' 56.1 Statement at ¶¶ 26–30.

In furtherance of his agreement to capitalize Cosy Goose USA, Mr. Diktopoulos contributed $65,000 to Cosy Goose USA through various wire transfers made between October 2003 and January 2004. *See* Pls' 56.1 Statement at ¶ 40; Defs' 56.1 Statement at ¶ 13. Mr. Diktopoulos also agreed to finance Cosy Goose USA by authorizing Mr. Weitman, on behalf of Laurevan, to pay certain debts Laurevan owed to Diktopoulos SA directly to Cosy Goose USA. *See* Pls' 56.1 Statement at ¶¶ 38, 41; Defs' 56.1 Statement at ¶ 15. This method of financing Cosy Goose USA, referred to by the parties as transferring "balance invoices" directly to Cosy Goose USA, was designed to circumvent delays and additional fees incurred in the process of Laurevan paying debts owed to Diktopoulos SA and Diktopoulos SA transferring the money back to Mr. Weitman to be used in the course of operating Cosy Goose USA. *See* Weitman Aff at ¶ 26 ("In other words, Laurevan paid some of Diktopoulos SA's money to Cosy Goose USA, instead of to Diktopoulos SA; this was a simpler

**2.** Defendants contend that the assets of Diktolpoulos SA were transferred to Cosy Goose Hellas in January of 2006. *See* Defs' 56.1 Statement at ¶ 20. Plaintiffs acknowledge the creation of Cosy Goose Hellas in June of 2005, but deny that Diktopoulos SA's assets have been transferred to Cosy Goose Hellas. *See* Docket # 74, Plaintiffs' Response to Defendants' 56.1 Statement (herein, "Pls' 56.1 Response") at ¶ 20.

procedure . . . and it saved money on bank wire transfer fees."). The parties agree that this was a method designed to capitalize Cosy Goose USA; the parties dispute, however, the total amount that was transferred to Cosy Goose USA from Laurevan as part of this "balance invoice" transfer arrangement. *See* Pls' 56.1 Statement at ¶¶ 42, 43 (identifying $45,689.71 and $16,000 as separate amounts transferred to Cosy Goose USA from Laurevan); *see* Docket # 79, Affidavit of Paul Weitman in Opposition to Plaintiffs' Cross–Motion for Summary Judgement, Defendants' Response to Plaintiffs' 56.1 Statement (herein, "Defs' 56.1 Response") at ¶ 42 (admitting that the transfer of $45,689.71 was a way of Diktopoulos SA financing Cosy Goose USA);at ¶ 43 (denying that $16,000 was transferred to Cosy Goose USA from Laurevan for two invoices issued to Laurevan by Diktopoulos SA).

Apart from these efforts to capitalize the new Cosy Goose USA venture, Plaintiffs allege that Mr. Weitman and Laurevan covered certain daily operating expenses incurred by Cosy Goose USA in an effort to keep Cosy Goose USA's costs down. *See, e.g.,* Pls' 56.1 Statement at ¶¶ 45–47 (asserting that Laurevan and Mr. Weitman provided Cosy Goose USA free rent, telephone services, utilities, marketing contacts, and other basic administrative services).[3] Plaintiffs additionally allege that Laurevan processed credit card transactions for Cosy Goose USA and that Laurevan paid expenses on behalf of Cosy Goose USA, which Cosy Goose USA later reimbursed. *See* Pls' 56.1 Statement at ¶¶ 34, 35; Defs' 56.1 Response at ¶¶ 34, 35 (acknowledging the transactions between Laurevan and Cosy Goose USA).

Notwithstanding the detail afforded above, the parties never entered into a written agreement evincing their understanding about the nature and scope of their business relationship. The only written document exchanged between the parties was faxed by Mr. Diktopoulos to Mr. Weitman on July 1, 2003. *See* Pls' 56.1 Statement at ¶ 8; *see also* Weitman Aff., Ex. D, July 2003 Facsimile (herein, "July 2003 Business Plan"). This document, which appears on Diktopoulos SA stationery, purports to offer Mr. Diktopoulos' "business plan" for Cosy Goose USA based upon the parties' discussion in White Plains, New York in June of 2003. *See* July 2003 Business Plan at p. 1. The plan, which consists of eight bullet points, outlines certain basic features of Cosy Goose USA, including a description of its marketing activities, its trading terms and policies, the manner in which the shoes will be sold, the pricing and pricing policy of the shoes, the management of Cosy Goose USA, and the sales projections for 2004, 2005, and 2006. *See id.* at pp. 2–3. The plan projected that Cosy Goose USA would earn $1,400,000 in 2004, $2,630,000 in 2005, and $3,500,000 in 2006. *See id.* at p. 3. The plan additionally provided that "[a]ll brand strategies [are] to be agreed to by Ariston,"[4] that "[a]ll management and trading policies [are] to be agreed by the board of Cosy Goose USA," that "[f]ormal trading reviews [are] to be held every six months," and that "[a][f]ull independent financial audit would take place every twelve months." *Id.*

Following the transmission of the July business plan from Mr. Diktopoulos to Mr. Weitman, Mr. Weitman incorporated Cosy Goose USA, Ltd. on August 8, 2003. *See*

---

3. Defendants object to these assertions of undisputed material fact on what appears to be hyper-technicalities. *See, e.g.,* Defs' 56.1 Response at ¶¶ 46, 47 (asserting that Laurevan "did not charge" Cosy Goose USA for rent and that Cosy Goose USA "utilized Laurevan's network" of business contacts).

4. Ariston appears to be part of, or another name for, Plaintiff Diktopoulos SA.

Pls' 56.1 Statement at ¶ 13. Similar to Laurevan, Cosy Goose USA is a closely held corporation organized under the laws of the State of New York with Mr. Weitman as its president and sole shareholder. *Id.* According to the Defendants' own 56.1 Statement, "Mr. Diktopoulos and Mr. Weitman agreed that Mr. Weitman would organize a new company, Cosy Goose USA, Ltd., to import, distribute and market Cosy Goose brand shoes in the United States." *See* Defs' 56.1 Statement at ¶ 6. In their Amended Complaint, Plaintiffs allege that "Mr. Weitman advised Plaintiff Diktopoulos that Defendant Weitman should be the sole shareholder of CGUSA because the incorporation of CGUSA would be delayed significantly if shareholders of CGUSA were citizens of another country." *See* Docket # 18, Plaintiffs' Amended Complaint at ¶ 22.[5]

Both sides agree in principle that Mr. Weitman was in charge of the daily operations of Cosy Goose USA, including the selection of the shoes to sell to retailers and the marketing of the shoes. *See* Pls'

56.1 Statement at ¶¶ 48, 49; Defs' 56.1 Response at ¶ 48 (agreeing that Mr. Weitman "made all decisions relating to the ordering and marketing of Cosy Goose brand shoes by Cosy Goose USA."). Under the terms of the July 2003 business plan, Mr. Diktopoulos and Mr. Weitman discussed the pricing of the shoes—the July 2003 plan specifies the retail, trade, and landed cost of the shoes—and Mr. Diktopoulos provided input on the marketing and selling of the shoes. *See* Pls' 56.1 Statement at ¶ 49.[6] The July 2003 plan also delineated the costs associated with the operation of Cosy Goose USA that would be deducted from Cosy Goose USA's sales proceeds, including commissions, logistics, bad debt, marketing, stock costs, management, control costs, and contributions, which were projected to consist of thirty-four to thirty-six percent of Cosy Goose USA's sales revenues. *See* Pls' 56.1 Statement at ¶ 53; July 2003 Business Plan at p. 4. Under this arrangement, the parties appear to have envisioned that Mr. Diktopoulos would receive the proceeds of

**5.** Defendants deny this allegation in their Answer. *See* Docket # 29, Defendants' Answer with Counterclaims at ¶ 8.

**6.** The Court is compelled at this point to note defense counsel's improvident use of its filings under Local Rule 56.1. Paragraph 49 of the Plaintiffs' 56.1 Statement is comprised of a singular assertion of fact that consists in large part of a direct quote from an affidavit Mr. Weitman, through his attorneys, filed in this case. Defense counsel, in response to this assertion of undisputed fact, *denies* this assertion. *See* Pls' 56.1 Statement at ¶ 49 (("Mr. Weitman decided how to market the shoes, and in doing so he 'consulted with Mr. Diktopoulos to get his input.') [Weitman August 2006 Aff. at ¶ 38]"); Defs' 56.1 Response at ¶ 48 ("Deny except admit that Paul Weitman, as president of Cosy Goose USA, made all decisions relating to the ordering and marketing of Cosy Goose brand shoes by Cosy Goose USA.").

Local Rule 56.1 is intended to ease the Court's job in considering dispositive motions and is intended to "free district courts from

the need to hunt through voluminous records without guidance from the parties." *Holtz v. Rockefeller Co.,* 258 F.3d 62, 74 (2d Cir.2001) (citations omitted). Filings made pursuant to Local Rule 56.1 are not intended to be vehicles for additional legal argument. Additionally, counsel cannot attempt to create or to negate undisputed facts by filing a subsequent affidavit that conflicts with an affiant's earlier sworn statement or deposition testimony. *See, e.g., Brown v. Henderson,* 257 F.3d 246, 252, 256 (2d Cir.2001); *see also* Docket # 81, Plaintiffs' Reply Memorandum of Law at p. 2. Defendants' submissions lack the candor and honest appraisal counsel should have used in reviewing *the facts* of this case. Denying a factual assertion that is predicated upon the Defendants' own filing is of no help to the Court because it forces the Court to engage in a plenary review of all of the filings in the case and it is contrary to the spirit and intent of judicial economy contained within the local rules.

the sales revenues of Cosy Goose USA, less the $50,000 commission paid to Mr. Weitman, less the eight percent commission paid to Laurevan, and less the aforementioned costs associated with the operation of Cosy Goose USA's business. *See* Pls' 56.1 Statement at ¶ 7 ("Mr. Diktopoulos is entitled to the proceeds derived by Cosy Goose USA, less the agreed expenses."); Defs' 56.1 Response at ¶ 7 ("Deny: the agreement at issue in this case was between Cosy Goose USA and Diktopoulos SA."). Plaintiffs assert that "[i]f and when Cosy Goose USA became profitable, Mr. Weitman and Mr. Diktopoulos would re-negotiate the terms of the Agreement such that each had a direct share in the profits." *See* Pls' 56.1 Statement at ¶ 6; Defs' 56.1 Response at ¶ 6 ("Deny: the agreement at issue in this case was between Cosy Goose USA and Diktopoulos SA."); Weitman Aff. at ¶ 16(d) ("If and when Cosy Goose USA became profitable, it would be decided how Diktopoulos SA and Cosy Goose USA would share the profits.").

Following the parties' meeting, and Mr. Weitman's incorporation of Cosy Goose USA, Mr. Diktopoulos, through Diktopoulos SA, began shipping shoes to Cosy Goose USA in September of 2003. *See* Weitman Aff. at ¶ 21. Mr. Weitman avers that Diktopoulos SA sent its final shipment of Cosy Goose brand shoes to Cosy Goose USA on August 11, 2005, and that two of Mr. Diktopoulos' family's other shoe manufacturing companies, Plaintiffs Cosy Goose Hellas and Tsitsivas Bros., sent shoes to Cosy Goose USA between October 20, 2005, and January 12, 2006. *See* Weitman Aff. at ¶ 22 (listing two shipments of shoes from Cosy Goose Hellas and three shipments of shoes from Tsitsivas Bros. to Cosy Goose USA). Although not specifi-

cally alleged in either of the 56.1 Statements, it appears that Mr. Weitman placed the orders for the shoes with Diktopoulos SA which Diktopoulos SA shipped to Cosy Goose USA from September 2003 to August 2005. *See* Weitman Aff. at ¶ 14 ("Mr. Diktopoulos and I agreed on the framework for an importation/distribution/marketing agreement whereby Diktopoulos SA would manufacture Cosy Goose brand shoes that I would order ..."); at ¶ 22 ("I, on behalf of Cosy Goose USA, had placed orders for Cosy Goose brand shoes only with Mr. Diktopoulos, with the understanding that the shoes would be manufactured by Diktopoulos SA."). Mr. Weitman asserts, however, that he never placed orders with either Plaintiffs Cosy Goose Hellas or Tsitisvas Bros., and that Mr. Diktopoulos placed the orders for the shoes with these other companies without Mr. Weitman's knowledge or approval. *See* Weitman Aff. at ¶ 22; Defs' 56.1 Statement at ¶¶ 17–18; *see* Docket # 74, Plaintiffs' Response to Defendants' Rule 56.1 Statement (herein, "Pls' 56.1 Response") at ¶¶ 17–18 (admitting that Mr. Diktopoulos placed the orders for the shoes with Cosy Goose Hellas and Tsitivas Bros.).

The parties also agree that Cosy Goose USA never "paid" Diktopoulos SA, or either of the other Diktopoulos family shoe manufacturing companies, for any of the shoes that were shipped to Cosy Goose USA. *See* Pls' 56.1 Statement at ¶ 68.[7] Although invoices were generated from Diktopoulos SA to Cosy Goose USA for each of the shipments of shoes made to Cosy Goose USA, Mr. Weitman asserts that these invoices were legally required for the shoes to be imported into the United States and therefore were generated by Diktopoulos SA only to facilitate their im-

---

**7.** Defendants' response to Plaintiffs' 56.1 Statement does not include a response to Plaintiffs' paragraphs 68, 70, 71, 72, 73, 74, and 75. *See* Defs' 56.1 Response at pp. 15–16. The facts contained in these paragraphs are therefore deemed as admitted.

portation. *See* Weitman Aff. at ¶ 28. Mr. Weitman also avers that "there were no agreed upon prices for the Cosy Goose shoes shipped to Cosy Goose USA." *See* Weitman Aff. at ¶ 28; Pls' 56.1 Statement at ¶¶ 68–69.

The parties do not dispute that $810,000 was transferred from Cosy Goose USA to Diktopoulos SA. *See* Pls' 56.1 Statement at ¶¶ 67–71; Defs' 56.1 Response at ¶¶ 67, 69 (acknowledging transfer of $810,000 from Cosy Goose USA to Diktopoulos SA).[8] Plaintiffs maintain that this amount was transferred "when Cosy Goose USA had 'money available ... outside of the funds needed to pay for commissions and other things,'" *see* Pls' 56.1 Statement at ¶ 71 (quoting Weitman deposition testimony), and that this amount was not intended to be considered as payment for any of the invoices generated along with the shipment of shoes to Cosy Goose USA, *see* Pls' 56.1 Statement at ¶ 69. Mr. Weitman has offered a similar classification of these payments, noting in his affidavit that Cosy Goose USA "never paid any of the invoices that Diktoppulos SA, Tsitivas and Cosy Goose Hellas sent for Cosy Goose shoes that were shipped to Cosy Goose USA," and that he and "Mr. Diktopoulos would negotiate the amount of each payment, based upon the amount that Cosy Goose USA could afford to send to Diktopoulos SA." *See* Weitman Aff. at ¶ 30. From the parties' submissions, it appears that only one such payment—the $810,000—was made to Diktopoulos SA from Cosy Goose USA during the course of their arrangement. Plaintiffs allege that over 69,000 pairs of shoes were sent to Cosy Goose USA from Diktopolous SA, Cosy Goose Hellas, and Tsitivas Bros. during their business relationship. *See* Pls' 56.1 Statement at ¶¶ 64–66; Defs' 56.1 Response at ¶¶ 64–66 (only acknowledging that the in-

voices generated reflect that shoes were sent to Cosy Goose USA).

The parties experienced difficulty in making this business arrangement successful. Mr. Weitman testified that he periodically sent statements to Mr. Diktopoulos informing him of Cosy Goose USA's progress—Defendants classify these as "cash flow analysis snapshot[s]"—and that he believed that Mr. Diktopoulos had an interest in the status of Cosy Goose USA. *See* Pls' 56.1 Statement at ¶¶ 52, 56. Mr. Diktopoulos maintains, however, that Mr. Weitman did not provide him with a copy of the annual accounting of Cosy Goose USA until some time in 2006 and that the accounting contains cost items incurred by Cosy Goose USA that exceeded the agreed upon costs that could be deducted from Cosy Goose USA's sales proceeds. *See* Pls' 56.1 Statement at ¶¶ 60, 61; Defs' 56.1 Response at ¶¶ 60, 61 (only admitting to substance of Mr. Weitman's deposition testimony and denying "knowledge or information sufficient to form a belief as to the truth of Item 61."). Plaintiffs argue that these additional costs charged to Cosy Goose USA by Mr. Weitman evince Mr. Weitman's efforts to shift certain costs from Laurevan to Cosy Goose USA at Cosy Goose USA's and Mr. Diktopoulos' expense. *See, e.g.,* Pls' 56.1 Statement at ¶ 63. Plaintiffs assert that the Cosy Goose USA records obtained during discovery disclose that as of "July 31, 2006, Cosy Goose USA had derived about $1,617,-361,62 in sales of Cosy Goose shoes." *See* Pls' 56.1 Statement at ¶ 72. Plaintiffs surmise that since that date Cosy Goose USA has made more than $2,000,000 in sales. *See* Pls' 56.1 Statement at ¶ 73. Defendants have offered no reply to these latter two facts, and they are therefore deemed to be admitted.

---

**8.** Neither party, unfortunately, specifies when this transfer was made.

Mr. Diktopoulos traveled to White Plains to meet with Mr. Weitman in April of 2006, at which time Mr. Weitman informed Mr. Diktopoulos that he "wanted to wind down the Cosy Goose USA business, and that [he] planned to sell the remaining Cosy Goose shoes that Cosy Goose USA had in its inventory, and liquidate the Cosy Goose USA business." *See* Jensen Aff., Ex. 2, Weitman Affidavit dated August 30, 2006 (herein, "Weitman Aug. Aff.") at ¶ 28. Although Mr. Weitman insists that this process of winding down Cosy Goose USA and potentially dividing the remaining assets between Mr. Diktopoulos and himself was agreeable to Mr. Diktopoulos, *id.,* Mr. Diktopoulos, along with the three Greek corporations that sent shoes to Cosy Goose USA, commenced this action shortly after the April 2006 meeting.

### B. *Procedural History*

Plaintiffs commenced this action against the Defendants in this Court pursuant to its grant of diversity jurisdiction, 28 U.S.C. § 1332, asserting claims sounding in breach of contract and breach of fiduciary duty. *See* Docket # 18, Plaintiffs' Amended Complaint. Defendants challenged the legal sufficiency of Plaintiffs' allegations in two Rule 12(b)(6) motions to dismiss, which the undersigned granted in part and denied in part on March 2, 2007. *See* March 2nd Decision. In the March 2nd Decision and Order, the Court determined that the Plaintiffs' allegations in the Amended Complaint satisfied the minimum pleading requirements for stating claims of an account stated based upon the presentation of invoices, an accounting, goods had and received, restitution, and the imposition of constructive trust. *See* March 2nd Decision at p. 2. The Court held, however, that the Plaintiffs' second and third claims for an account stated based upon alleged discount equity contributions and alleged outstanding contribu-

tions for sold Cosy Goose inventory failed to plead the necessary facts needed to articulate account stated claims under New York law. *See* March 2nd Decision at pp. 19–22. The Court dismissed the second and third causes of action without prejudice; Plaintiffs have elected not to reassert these claims.

Plaintiffs' claims of an accounting and imposition of a constructive trust are equitable claims that can only be maintained against the Defendants in the presence of a fiduciary relationship among the parties. *See Palazzo v. Palazzo,* 121 A.D.2d 261, 265, 503 N.Y.S.2d 381 (1st Dep't 1986) (noting that there must be a fiduciary relationship in order to maintain an accounting); *Chipman v. Steinberg,* 106 A.D.2d 343, 344, 483 N.Y.S.2d 256 (1st Dep't 1984) (noting that there must be a fiduciary relationship in order to seek the imposition of a constructive trust). The Plaintiffs, however, do not have to establish the presence of a fiduciary relationship as a condition precedent to asserting their other common law claims against the Defendants sounding in contract or quasi-contract, such as their claims for an account stated, goods had and received, or unjust enrichment and restitution. Defendants' assertion that all of the Plaintiffs' claims against Mr. Weitman and Laurevan Shoe Corp. should be dismissed because of the absence of a joint venture, is thus without merit.

Defendants have repeatedly insisted that they have challenged the existence of the alleged joint venture among the parties from the outset of this litigation. As made clear by this Court in its prior Decision and Order, and during numerous pretrial conferences, the issue of whether the parties entered into an enforceable joint venture has never squarely been put to this Court for resolution. *See* March 2nd Decision at p. 26 ("Whether there exists some dispositive issue of law surrounding

the viability of the alleged joint venture ... remains unresolved and un-briefed by the parties."). The Court's prior Decision focused on the propriety of the Plaintiffs' causes of action. The Defendants' motion to dismiss, while possibly intended to address the existence of a joint venture, did not address the legal sufficiency of the Plaintiffs' allegations that the parties had entered into a joint venture in 2003. *Id.* The Court, moreover, raised two discrete issues not addressed by counsel in the Defendants' motion to dismiss: (1) the application of New York's statute of frauds and (2) the effect of the incorporation of Cosy Goose USA and the application of the merger doctrine. *See* March 2nd Order at pp. 24–25 and n. 5.

### C. Parties' Cross–Motions for Summary Judgment

Following an extensive period of pretrial discovery, the parties have filed the instant cross-motions for summary judgment pursuant to FED.R.CIV.P. 56 seeking a judicial determination as a matter of law as to whether the parties entered into a joint venture in 2003. Defendants argue that Defendants Paul Weitman and Laurevan Shoe Corp. cannot be considered joint venturers because the agreement between the parties is too vague and does not spell out with sufficient particularity the equity interests of each of the alleged joint venturers. *See* Docket #70, Defendants' Memorandum of Law in Support of Defendants's Motion for Summary Judgment (herein, "Defs' Mem.") at p. 6. Defendants also argue that the agreement between the parties never addressed the degree of liability each party would share for losses arising out of their agreement and that absent such an agreement to allocate losses among co-venturers there can be no legally cognizable joint venture. *Id.* As noted above, Defendant Cosy Goose USA has not joined in this portion of the Defendants' motion for summary judgment; Defendant Cosy Goose USA, however, has moved for summary judgment in its favor on one of its counterclaims against the Plaintiffs sounding in breach of warranty of merchantability. *See* Defs' Mem. at p. 22. Counsel for Cosy Goose USA maintains that some of the goods shipped to it by Plaintiffs were defective, that Plaintiffs should, as a matter of law, be held liable for those defects, and that the Court should schedule an inquest to assess damages. *Id.*

Plaintiffs have cross-moved for summary judgment seeking a judicial determination that the elements of a joint venture under New York law have been satisfied as a matter of law and that no reasonable juror could conclude that there did not exist a joint venture among the parties. *See* Docket #75, Plaintiffs' Memorandum of Law in Support of Plaintiffs' Cross–Motion for Summary Judgment and in Opposition to Defendants' Motion for Summary Judgment (herein, "Pls' Mem.") at p. 5. Plaintiffs contend that the parties each shared in the control and operation of the Cosy Goose USA joint venture, that each party stood to enjoy in the success of the joint venture, and that each party was subject to some degree of loss. Plaintiffs additionally oppose Defendant Cosy Goose USA's motion for summary judgment on its breach of warranty of merchantability claim and seek summary judgment in their favor on their alternative claim of restitution in the event that the Court determines that there exists no legally enforceable joint venture among the parties. *See* Pls' Mem. at pp. 20–21, 23.

### DISCUSSION

#### A. Summary Judgment Standard and Local Rule 56.1

##### 1. Summary Judgement Standard

Pursuant to the Federal Rules of Civil Procedure, summary judgment "should be

rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 320–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is "material" when it may affect the outcome of a case under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* A trial judge may, therefore, grant summary judgment only if there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law. *Id.* at 250, 106 S.Ct. 2505. The inquiry performed is the threshold inquiry of determining whether there are any genuine factual issues that properly can be resolved only by a finder of fact. *Id.*

Summary judgment may be granted only "[i]f after discovery, the nonmoving party 'has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof.'" *Berger v. United States*, 87 F.3d 60, 65 (2d Cir.1996) (quoting *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548) (alteration in original). "The nonmoving party must have 'had the opportunity to discover information that is essential to his [or her] opposition' to the motion for summary judgment." *Trebor Sportswear Co. v. The Limited Stores, Inc.*, 865 F.2d 506, 511 (2d Cir.1989) (quoting *Anderson*, 477 U.S. at 250 n. 5, 106 S.Ct. 2505). Moreover, a court should "constru[e] the evidence in the light most favorable to the nonmoving party and draw[ ] all reasonable inferences in its favor." *Mount Vernon Fire Ins. Co. v. Belize NY, Inc.*, 277 F.3d 232, 236 (2d Cir.2002); *Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 97 (2d Cir.2001); *Quinn*

*v. Green Tree Credit Corp.*, 159 F.3d 759, 764 (2d Cir.1998); *see also Anderson*, 477 U.S. at 261 n. 2, 106 S.Ct. 2505. Thus, "[o]nly when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted." *Cruden v. Bank of New York*, 957 F.2d 961, 975 (2d Cir.1992) (quoting *H.L. Hayden Co. of New York, Inc. v. Siemens Med. Sys. Inc.*, 879 F.2d 1005, 1011 (2d Cir. 1989)).

### 2. Local Rule 56.1

Pursuant to the Local Rules for the Southern and Eastern Districts of New York, a moving party must attach a "separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." *See* Local Rule 56.1(a). A similar requirement is imposed upon the party opposing the motion for summary judgment. *See* Local Rule 56.1(b) (requiring the party opposing a motion for summary judgment to identify the material facts which it contends are in dispute). Should the non-moving party fail to respond to the facts alleged by the moving party to be undisputed, those facts "will be deemed to be admitted for purposes of the motion...." Local Rule 56.1(c). Importantly, "[e]ach statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Federal Rule of Civil Procedure 56(e)." *See* Local Rule 56.1(d). This requirement "free[s] district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz v. Rockefeller Co.*, 258 F.3d 62, 74 (2d Cir.2001) (citations omitted).

■ Thus, as a general rule, the Court may accept as true the material facts as-

serted by the moving party in an unopposed Rule 56.1 statement. *See Gubitosi v. Kapica*, 154 F.3d 30, 31 n. 2 (2d Cir. 1998). The Second Circuit has cautioned, however, that the opposing party's failure to comply with the local rules does not absolve the moving party from meeting its own burden of proof in its motion for summary judgment. *See Holtz*, 258 F.3d at 72–74. The *Holtz* court also noted that a district court has "broad discretion" to determine whether to overlook noncompliance with the local rules. *Id.* at 73. Synthesizing the spirit of the Local Rules, and the *Holtz* court's decision, failure to respond to a moving party's Rule 56.1 Statement may mean that the uncontested facts contained therein will be assumed to be true for the purposes of the motion if such facts are properly supported by citations to admissible evidence. *See Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir.2003).

## B. *Application of New York's Statute of Frauds*

This Court previously raised the prospect that New York's statute of frauds provision, N.Y. GEN. OBLIG. LAW § 5–701, might bar the Plaintiffs' claims because such claims are predicated upon the parties' alleged oral agreement. *See* March 2nd Decision at p. 25. Defendants now assert in their motion for summary judgment that the agreement between the parties should not be enforced because it cannot be performed within one year and because it is not memorialized by a writing or written contract. *See* Defs' Mem. at pp. 11–17. After considering New York case law on this point, the Court concludes that this argument is without merit and does not serve as a bar to Plaintiffs' claims.

New York's statute of frauds provision has two subsections that could, if satisfied, bar this action based upon an alleged oral agreement. Section 5–701(a)(1) of New York's General Obligations Law requires that all agreements that cannot be performed within one year must be in writing, *see* N.Y. GEN. OBLIG. LAW § 5–701(a)(1), and Section 5–701(a)(10) provides that a contract to pay for the services of an intermediary who has made business arrangements is only enforceable if in writing, *see* N.Y. GEN. OBLIG. LAW § 5–701(a)(10). For the reasons discussed below, the Court is satisfied that the nature of relationship between the parties is more sophisticated than that of business intermediaries and that the nature of the relationship between the Plaintiffs and Defendants transcends this limited business relationship and is not subject to the provisions of § 5–701(a)(10). *See, e.g., Snyder v. Bronfman*, 19 Misc.3d 1126, 2008 WL 1883411, at *3 (New York Co. April 24, 2008).[9] As such, the Court concludes that N.Y. GEN. OBLIG. LAW § 5–701(a)(10) does not bar this action.

The Court also concludes that § 5–701(a)(1) does not apply to this case because the agreement between the parties did not specify a term of duration. In order for § 5–701(a)(1) to bar enforcement of an oral agreement, the parties must not be capable of performing the terms of the agreement within one year. *See Guilbert v. Gardner*, 480 F.3d 140, 151 (2d Cir. 2007). In similar cases, where there have been oral agreements that have no specific term of duration, courts have held that such agreements are terminable at will and do not fall within this provision of the New York's statute of frauds. *See Kidz Cloz, Inc. v. Officially for Kids, Inc.*, 320

---

9. I also note that Defendants have not relied upon this provision in their motion for summary judgment.

F.Supp.2d 164, 172 (S.D.N.Y.2004); *Alnwick v. European Micro Holdings, Inc.*, 281 F.Supp.2d 629, 644–45 (E.D.N.Y.2003) (explaining that an oral joint venture agreement without a specified duration is deemed terminable at will). The fact that the agreement between the parties in fact lasted for more than one year does not change this calculus. *See, e.g., Ebker v. Tan Jay International, Ltd.*, 739 F.2d 812, 827 n. 19 (2d Cir.1984) ("if [plaintiff] had testified to a joint venture that would continue until the [defendant] had achieved a particular level of profitability, at which time the venture would be sold, or until the time was ripe for it to go public, this would have avoided the barrier of § 5–701(a)(1) of the New York General Obligations Law, since in theory, however unlikely in fact, the level could have been reached within a year.") (citations omitted). The statute of frauds will thus only apply when the agreement's terms specify that the agreement will last longer than one year; the fact that an agreement without a specified duration can last for more than one year does not subject the agreement to the written document requirement of N.Y. GEN. OBLIG. LAW § 5–701(a)(1). *See Ebker*, 739 F.2d at 827 n. 19 ("It matters not, however, that it was unlikely or improbable that a venture would be performed with one year. The critical test, instead, is whether by its terms the agreement is not to be performed within a year.") (citing and quoting *Freedman v. Chem. Construction Corp.*, 43 N.Y.2d 260, 401 N.Y.S.2d 176, 372 N.E.2d 12 (1977)).

Although the July 2003 business plan projected Cosy Goose USA sales over a period lasting more than one year, *see* July 2003 Business Plan at p. 4, there is no evidence in the record that supports the assertion that this sales projection was designed to bind the parties to a three year contract or served as their agreement as to the duration of their relationship. *See, e.g., Scholastic, Inc. v. Harris*, 259 F.3d 73, 85–87 (2d Cir.2001) ("Whether a partnership is terminable at will is a question of fact, and the jury should determine what the parties intended if the agreement does not fix an express duration."); *see* Weitman Aff. at ¶ 16(d) ("If and when Cosy Goose USA became profitable, it would be decided how Diktopoulos SA and Cosy Goose USA would share the profits."); Pls' 56.1 Statement at ¶ 6. Thus, even if performance of the parties' oral agreement within one year was unlikely or "well nigh impossible," such impracticability does not place the oral agreement within the proscription of N.Y. GEN OBLIG. LAW § 5–701(a)(1). *Ebker*, 739 F.2d at 827 n. 19.

The Defendants' motion for summary judgment seeking dismissal of the Plaintiffs' claims based upon the absence of a written agreement between the parties under N.Y. GEN. OBLIG. LAW § 5–701 therefore is denied.

## C. Existence of a Joint Venture Under New York Law

A joint venture has been described "as a nebulous concept whose boundaries are not precisely drawn. Defining a joint venture is easier than identifying it, for each case depends upon its own facts." *Backus Plywood Corp. v. Commercial Decal*, 208 F.Supp. 687, 690 (S.D.N.Y.1962). This Court stands in full agreement with this commentary offered over forty-five years ago. Since Judge Edelstein rendered this observation, New York federal and state courts have consistently avoided articulating and applying the law of joint ventures in a coherent or reconcilable manner. Courts continue to differ about two discrete lines of analysis involving the law of joint ventures in New York, both of which are raised in the instant motions: (1) the nature of the loss sharing requirement needed to form a joint venture; and (2) the

effect the subsequent incorporation of the joint venture has on the joint venture's existence, which is also referred to as the merger doctrine. This Court is cognizant of the fact that the various ways business partners seek to structure their business relationships accounts for the wide divergence in the case law pertaining to joint ventures. Such factual variations, however, should compel the courts to craft a coherent body of case law governing such arrangements, especially in light of the fact that a joint venture "is a voluntary relationship, the origin of which is wholly *ex contractu*, i.e., it is not a status created by law." *Id.* Allowing a body of case law to continue to exist that offers something for everyone breeds confusion and places judges at the intersection of competing lines of reasoning with little guidance on how to apply the neutral principles of law that should govern disputes brought to the courts for resolution.

Defendants argue that neither Mr. Weitman nor Laurevan Shoe Corp. were subject to any possible risk of loss arising out of the agreement with Plaintiffs and that the elements of a joint venture, as a matter of law, cannot be met. Defendants' argument appears to be premised in part on the fact that Mr. Weitman incorporated Cosy Goose USA shortly after Mr. Diktopoulos sent Mr. Weitman the July 2003 business plan. Thus, while Defendants ostensibly argue that the elements of a joint venture cannot be established, Defendants also rely on the subsequent incorporation of Cosy Goose USA in August of 2003 in support of their assertion that there exists no potential liability on the part of Mr. Weitman or Laurevan arising out of the joint venture. *See* Defs' Mem. at p. 11 ("Common sense compels the obvious conclusion that Mr. Weitman would not have incorporated Cosy Goose USA if he intended Laurevan and himself to be 'joint venturers,' who would be liable for a pro-

portionate share of the 'joint venture's' debts.").

Plaintiffs respond to Defendants' argument with the assertion that precise profit and loss allocation among co-venturers is not required under New York law in order to form a joint venture, and that, where appropriate, the law will imply a loss sharing agreement among co-venturers. *See* Pls' Mem. at pp. 9–10. Plaintiffs additionally maintain that each of the Defendants contributed property, knowledge and skill to the joint venture, that the Defendants each stood to lose if the joint venture was not successful, and that each of the parties shared a degree of control over the joint venture. *Id.*

For the following reasons the Court concludes that the elements of a joint venture under New York law cannot be established and that there exists no genuine issue of material fact as to whether the parties entered into a joint venture. As explained below, the Plaintiffs' argument in support of the formation of a joint venture finds support only in a discrete minority of New York cases that appear to liberalize the elements of a joint venture in a perfunctory fashion. The Court emphasizes, however, that if there were genuine issues of material fact as to whether the parties entered into a joint venture, or if the Court concluded that the parties entered into such an agreement as a matter of law, that the secondary argument advanced by Defendants pertaining to the subsequent incorporation of Cosy Goose USA by Mr. Weitman would be without merit. A significant majority of New York courts have recognized that co-venturers may legally retain their joint venture status among themselves while operating as a corporation to the rest of the world and that the subsequent incorporation of a joint venture does not obviate the existence of a joint venture unless the parties specifically intend to merge the joint venture into the

corporation. *See Sagamore Corp. v. Diamond West Energy Corp.*, 806 F.2d 373, 378–79 (2d Cir.1986); *Richbell Info. Srvcs. v. Jupiter Partners, L.P.*, 309 A.D.2d 288, 299–300, 765 N.Y.S.2d 575 (1st Dep't 2003); *Blank v. Blank*, 222 A.D.2d 851, 852–53, 634 N.Y.S.2d 886 (3d Dep't 1995).[10]

### 1. Elements of a Joint Venture Under New York Law

■■■ There are five elements that courts consider when assessing whether a joint venture exists under New York law. A joint venture exists in New York when (1) two or more persons enter into an agreement for profit; (2) the parties intend to be associated as joint venturers; (3) each of the venturers contributes something of value to the venture, such as property, skill, knowledge or effort; (4) each co-venturer has some degree of control over the venture; and (5) the co-venturers agree to some division of profit and loss allocation. *See Dinaco Inc. v. Time Warner, Inc.*, 346 F.3d 64, 67–68 (2d Cir.2003); *Itel Containers Int'l Corp. v. Atlanttrafik Express Serv. Ltd.*, 909 F.2d 698, 701 (2d Cir.1989). The party seeking to evince the existence of a joint venture must establish each of these elements, and on a motion for summary judgment, the party seeking to establish the existence of a joint venture as a matter of law must establish that there exists no genuine issue of material fact as to whether the parties entered into a joint venture. *See Kidz Cloz, Inc.*, 320 F.Supp.2d at 171; *Halloran v. Ohlmeyer Communs. Co.*, 618 F.Supp. 1214, 1218–19 (S.D.N.Y.1985). As noted above, co-venturers owe each other a fiduciary duty and operate in a relationship similar to that of partners in a partnership. *See Kidz Cloz, Inc.*, 320 F.Supp.2d at 171.

■■ Parties can evince their intent to be joined as joint venturers expressly through language in an agreement or impliedly through actions and conduct. *Id.* In instances of alleged oral joint ventures, parties may evince their intent to be bound as joint venturers by commingling their property, skills, and efforts such that their individual contributions are subject to their co-venturers' actions, efforts, and failures. *Id.* (citing *Zeising v. Kelly*, 152 F.Supp.2d 335, 348 (S.D.N.Y.2001)). The vast majority of courts hold that in addition to the contributions each party must make to a joint venture, each party must also be subject to "submit to the burden of making good the losses" of the joint venture. *Dinaco, Inc.*, 346 F.3d at 68 (citing *Steinbeck v. Gerosa*, 4 N.Y.2d 302, 317, 175 N.Y.S.2d 1, 151 N.E.2d 170 (1958)). Numerous New York authorities have emphasized that a putative venturer's loss of anticipated profits from a collaborative business effort is not sufficient to make that individual a joint venturer, *see Mallis v. Bankers Trust Co.*, 717 F.2d 683, 691 (2d Cir.1983); *DeVito v. Pokoik*, 150 A.D.2d 331, 332, 540 N.Y.S.2d 858 (2d Dep't 1989), and that a putative joint venturer who only stands to lose the value of his or her

---

**10.** In the presence of such case law, it is unclear to the undersigned how other courts continue to hold that a joint venture terminates upon the subsequent incorporation of the venture when the parties evince no intent to merge the joint venture into the corporation and when such duality does not limit or impair the rights of third parties or the functioning of the corporation. *See, e.g., Nasso v. Seagal*, 263 F.Supp.2d 596, 618 (E.D.N.Y. 2003) ("when parties form a corporation to carry out the business of the partnership, they cease to be partners.") (citing New York case law in support of proposition); *Weiner v. Hoffinger Friedland Dobrish & Stern, P.C.*, 298 A.D.2d 453, 455, 749 N.Y.S.2d 255 (2d Dep't 2002). Such conclusory assertions of law citing and relying upon *Weisman v. Awnair Corp.*, 3 N.Y.2d 444, 165 N.Y.S.2d 745, 144 N.E.2d 415 (1957), which is the New York Court of Appeals decision that appeared to disallow such duality, fail to account for the appreciable limitations that have subsequently been placed on *Weisman's* holding.

services rendered in connection with the venture does not submit himself or herself to the liabilities and losses of the venture and thus is not considered a joint venturer, *Dinaco, Inc.*, 346 F.3d at 68; *Kidz Cloz, Inc.*, 320 F.Supp.2d at 175; *B. Lewis Productions v. Angelou*, 01 Civ. 530(MBM), 2003 WL 21709465, at *12 (S.D.N.Y. July 23, 2003), *aff'd in part*, 99 Fed.Appx. 294 (2d Cir.2004); *Weinreich v. Sandhaus*, 83 Civ. 3966(CES), 1989 WL 130641 at *3–4 (S.D.N.Y. July 24, 1989) ("also relevant to the inquiry of whether a party 'risked loss' is whether he [or she] also agreed to assume personal responsibility for the potential legal liabilities of the enterprise.").

There exists, however, a minority of courts in New York that recognize that under certain circumstances a joint venture may be established when a possible co-venturer only stands to lose the value of his or her services contributed to the joint venture. *See Cobblah v. Katende*, 275 A.D.2d 637, 639, 713 N.Y.S.2d 723 (1st Dep't 2000); *Penato v. George*, 52 A.D.2d 939, 942, 383 N.Y.S.2d 900 (2d Dep't 1976); *Mariani v. Summers*, 3 Misc.2d 534, 52 N.Y.S.2d 750 (N.Y.Co.1944), *aff'd without opinion*, 269 A.D. 840, 56 N.Y.S.2d 537 (1st Dep't 1945). These cases reason that when there is no reasonable expectation that the joint venture will suffer losses then the parties need not discuss the allocation of losses, and that in such cases, where there is an absence of an agreement to share losses, the law will imply an agreement to share losses in a manner similar to the parties' agreement to share profits. *See Cobblah*, 275 A.D.2d at 639, 713 N.Y.S.2d 723 (noting that the absence of a reasonable expectation to suffer losses does not prevent the possible formation of a joint venture); *Penato*, 52 A.D.2d at 942, 383 N.Y.S.2d 900 (observing that there is no need to plead a loss sharing agreement at the pleading stage if all the "other elements of a joint venture are present."). It bears repeating, however, that only a minority of courts have acknowledged that a potential co-venturer's loss of the value of his or her services or start up capital may suffice to establish the loss sharing element of a joint venture, *see, e.g., Ramirez v. Goldberg*, 82 A.D.2d 850, 852, 439 N.Y.S.2d 959 (2d Dep't 1981), or that no loss sharing arrangement is necessary in order to form a joint venture, *see Mariani*, 3 Misc.2d at 537–38, 52 N.Y.S.2d 750. Such decisions have come under heavy scrutiny and derision from judges of this Court for not being in accord with the elements of a joint venture under New York law. *See, e.g., Yonofsky v. Wernick*, 362 F.Supp. 1005, 1032 n. 76 (S.D.N.Y. 1973); *Backus Plywood Corp.*, 208 F.Supp. at 691; *Artco, Inc. v. Kiddie Inc.*, 88 Civ. 5734(MJL)(SEG), 1993 WL 962596, at *8 (S.D.N.Y. Dec. 28, 1993), Report and Recommendation adopted by, *Artco, Inc.*, 88 Civ. 5734(MJL), 1994 WL 583172 (S.D.N.Y. Oct. 21, 1994).

D. *Defendants' Motion for Summary Judgment Challenging the Existence of Joint Venture and Plaintiffs' Cross–Motion for Summary Judgment Seeking Confirmation of a Joint Venture*

▪ Defendants Weitman and Laurevan posit that the parties never agreed upon a profit and loss allocation with the Plaintiffs and that in the absence of such an allocation the fiduciary obligations co-venturers owe one another does not exist, and that therefore motion for summary judgment dismissing the fiduciary-duty based claims should be granted. Plaintiffs counter that there exists ample evidence supporting their assertion that the parties entered into a joint venture as a matter of law and seek summary judgment confirming the existence of a joint venture among the parties. Based upon a review of the case law, the Court concludes that Defendants' motion for summary judgment on this point should be granted and that the Plain-

tiffs' motion for summary judgment should be denied.

Repeated courts within this Circuit, this District, and this State have considered similar allegations of joint venture formation and have concluded that an absence of an agreement to share in the losses of a joint venture is fatal to the formation of a joint venture. These courts consistently note that an agreement to share in profits alone does not satisfy the joint venture formation requirements and that joint venturers must be subject to more than just the loss of their investment in the venture. Former–Chief Judge Mukasey of this Court distilled this principle of the law of joint ventures best in *B. Lewis Prod.*, in which he observed that when a putative joint venturer stands to lose only his or her contribution to the joint venture, the risk of loss element becomes "indistinguishable from the separate requirement that each joint venturer make some contribution of property, financing, skill, knowledge or effort to the venture." 2003 WL *21709465 at *11; *see also Artco, Inc.*, 1993 WL 962596, at *10 (noting that if "simply expending efforts to set up a venture were sufficient to satisfy the essential element of sharing of losses, the requirement could nearly always be satisfied ...."). Thus, in order for an agreement to qualify as a joint venture, co-venturers must agree, either expressly or impliedly, to share liability for the possible obligations, debts, and losses of the joint venture itself. *See Dinaco*, 346 F.3d at 68 (highlighting that parties must "guarantee[ ] or agree[ ] to guaranty ... [the] financial or contractual obligations" of the joint venture); *Kidz Cloz, Inc.*, 320 F.Supp.2d at 171–72, 175 (summarizing

case law and holding that the absence of a discussion of sharing losses resulted in the absence of an "indispensable" element of a joint venture); *Weinreich*, 1989 WL 130641 at *4 ("the sharing of liability for the actions of one another in the conduct of a partnership or joint venture goes to the core of the fiduciary obligations established by such a relationship.").

This particular articulation of the loss-sharing element of a joint venture could lead one to conclude that the subsequent incorporation of a joint venture would negate the existence of the joint venture because, by definition, no one joint venturer would be liable personally for the obligations, debts, or losses of the incorporated joint venture. This appears to be an argument advanced by defense counsel. *See* Defs' Mem. at p. 11; *see also* Weitman Aff. at ¶ 39. No case cited by Defendants, however, stands for the proposition that the subsequent incorporation of a joint venture vitiates the formation of the joint venture *ab initio*. The "merger doctrine," which addresses the subsequent incorporation of a joint venture, evaluates whether a joint venture merges into a subsequently formed corporation or other business entity; this line of reasoning does not support the retroactive obviation of the joint venture and elimination of the fiduciary responsibilities shared among joint venturers.

The Court, however, need not delve too deeply into the impact of Mr. Wetiman's incorporation of Cosy Goose USA in August of 2003 because of the absence of any evidence that would tend to support the assertion that Mr. Weitman or Laurevan agreed to share in the losses of the Cosy Goose USA venture.[11] Both sides agree

---

11. I note that although the incorporation of Cosy Goose USA acted as a shield for Mr. Weitman against any potential claim asserted by a third party, such as a breach of contract claim or a tort claim, the incorporation of

Cosy Goose USA would not have prevented Mr. Weitman and Mr. Diktopoulos from agreeing to share in the losses of Cosy Goose USA jointly. *See Richbell*, 309 A.D.2d at 299–300, 765 N.Y.S.2d 575 (noting that individu-

that loss sharing was neither envisioned nor discussed between Mr. Diktopoulos and Mr. Weitman, *see* Defs' Mem. at p. 11; Pls' Mem. at p. 8 ("The parties did not reasonably anticipate losses, but to the extent that there were losses Mr. Diktopoulos agreed to cover them."), and Mr. Weitman testified at his deposition that he believed that if there were any losses that arose from the Cosy Goose USA venture that Mr. Diktopoulos would be responsible for covering such losses and that he or Laurevan would be reimbursed, *see* Pls' 56.1 Statement at ¶ 10.[12] Plaintiffs' assertion that partners do not have to discuss loss sharing only finds support in the minority rule that has been employed in cases where there is no reasonable expectation among the parties that losses will result from a singular transaction or a limited series of business transactions. *See Cobblah,* 275 A.D.2d at 639, 713 N.Y.S.2d 723; *Dundes v. Fuersich,* 6 Misc.3d 882, 791 N.Y.S.2d 893, 895 (New York Co.2004) (relying upon *Cobblah* and *P.F.G. Indus. v. Tel–Glass, Inc.,* 49 A.D.2d 112, 114, 373 N.Y.S.2d 141 (1st Dep't 1975)). Given the elaborate nature of the parties' transactions, this rule governing a singular business dealing between parties is inapplicable. *See Dundes,* 791 N.Y.S.2d at 895 (summarizing *P.F.G. Indus.,* 49 A.D.2d 112, 373 N.Y.S.2d 141 (1st Dep't 1975) as holding that "failure to allege agreement to share losses was not fatal to joint venture that involved a single transaction that was concluded profitably.").

Plaintiffs' additional argument that the Defendants risked losing the value of their own services and contributions, such as rent and utilities, does not satisfy the risk of loss requirement needed to form a joint venture under New York's majority rule. In the absence of any discussion about loss sharing among the venturers, the parties simply "did not have an agreement to share losses." *Kidz Cloz, Inc.,* 320 F.Supp.2d at 175 (citing *Precision Testing Labs. v. Kenyon Corp. of America,* 644 F.Supp. 1327, 1349 (S.D.N.Y.1986)). In the absence of an agreement to share in the losses of the venture, as here, there can be no joint venture.

In rendering this decision, the Court acknowledges that the assertions put forth by Plaintiffs' counsel might create a genuine issue of material fact as to whether there existed a joint venture under the minority rule: Plaintiffs allege that Defendants Weitman and Laurevan stood to lose the value of their services and their contributions to the Cosy Goose USA venture. *See* Pls' 56.1 Statement at ¶¶ 45–47; *see also* Pls' Mem. at pp. 8–10 (enumerating loss sharing potential among parties). This argument, however, finds scant support in the articulation of the risk-sharing element of a joint venture applied by the majority of courts within this Circuit and this State. *See, e.g., Dinaco,* 346 F.3d at 68; *Kidz Cloz, Inc.,* 320 F.Supp.2d at 171–72; *B. Lewis Prod.,* 2003 WL 21709465 at *12; *Weinreich,* 1989 WL 130641 at *3–4;

---

als may "'act[ ] as partners among themselves and as a corporation to the rest of the world' where the rights of third parties … are not involved, and the parties' rights under the partnership agreement … are 'not in conflict' with the corporation's functioning."). It is for this reason that the Court concludes that had Plaintiffs been able to establish a genuine issue of material fact on their claim of the formation of a joint venture that the merger argument advanced by Defendants would be without merit.

**12.** The Court finds it curious that Defendants elected to *deny* this assertion of undisputed material fact, a fact that is beneficial to their argument in this case and dispositive of the issues *Defendants* raise. *See* Defs' 56.1 Response at ¶ 10 ("Deny."). Moreover, Defendants' denial of a fact admitted at deposition by Mr. Weitman—who is both the individual defendant and the sole principal of both corporate defendants—is shortsighted and improvident.

*Steinbeck,* 4 N.Y.2d at 317, 175 N.Y.S.2d 1, 151 N.E.2d 170; *Kaufman v. Torkan,* 51 A.D.3d 977, 979, 859 N.Y.S.2d 253 (2d Dep't 2008). Plaintiffs may have a strong equitable argument that the more liberal risk of loss element under the minority rule is the proper analysis courts should use in cases like this one. The Court can discern some risk of loss that the Defendants could incur as a result of their participation in the Cosy Goose USA venture, such as the loss of rent, utilities, and employee productivity, which have been highlighted by Plaintiffs' counsel, as well as the possibility that Cosy Goose USA could have been a defendant in any action arising in tort or contract brought by a dissatisfied consumer or customer who purchased Cosy Goose USA shoes.[13]

These risks of liability and loss unique to the Defendants, which the Defendants would likely seek to off-set through an action in contribution or indemnification against the Plaintiffs, however, do not satisfy the risk of loss element under New York's majority test for the formation of a joint venture. Under the majority rule there must be some evidence that the co-venturers agreed to share and submit to the burden of making good the losses of the joint venture. *See Steinbeck,* 4 N.Y.2d at 317, 175 N.Y.S.2d 1, 151 N.E.2d 170. The parties agree, however, that Mr. Weitman did not stand to lose any capital from his efforts in the Cosy Goose venture and, more importantly, that he did not stand to incur any personal liability for any losses or debts arising out of the Cosy Goose USA venture. The agreement, as outlined by the July 2003 business plan and executed by the parties, insulated Mr. Weitman and Laurevan Shoe Corp. from any liability for possible losses or debts arising out

of the Cosy Goose USA venture and only provided Mr. Weitman and Laurevan Shoe Corp. a share of the gross proceeds of Cosy Goose USA. *See* Pls' 56.1 Statement at ¶¶ 4–5; *see also DeVito,* 150 A.D.2d at 332, 540 N.Y.S.2d 858 ("the sharing of gross returns[ ] does not in and of itself establish a joint venture."). Considering the nature of the arrangement between the parties, the Court could not even employ the minority rule permitting courts to craft a loss sharing agreement that parallels a profit sharing agreement; the parties concede that Mr. Weitman was paid a flat salary of $50,000 per year, that Laurevan was paid an eight percent commission on all sales, and that Mr. Weitman and Mr. Diktopoulos would renegotiate the terms of their agreement if and when Cosy Goose USA became profitable. *See* Pls' 56.1 Statement at ¶ 6; Weitman Aff. at ¶ 16. Under these circumstances there is no evidence from which a jury could conclude that Mr. Weitman agreed to submit to the losses of the Cosy Goose joint venture. *See Halloran,* 618 F.Supp. at 1218–19 (concluding that summary judgment was inappropriate because of issue of fact surrounding parties' understanding about loss-sharing). Under these circumstances there is even less evidence that could support the Court grafting a risk of loss allocation onto the oral agreement between the parties. *See Artco, Inc.,* 1993 WL 962596, at 9 (emphasizing that "the very structure of the proposed relationship as to profits was such that no inference of a pro rata sharing of losses is possible.").

This Court is constrained to apply New York's joint venture jurisprudence as developed by the New York Court of Appeals and as interpreted and applied by the Second Circuit. The New York Court of Ap-

---

**13.** Although Cosy Goose USA's incorporation would have shielded Mr. Weitman personally from any such claim, *see supra* at n. 11, Cosy Goose USA is Mr. Weitman's alter ego, and Mr. Weitman as Cosy Goose USA's president, would have to coordinate Cosy Goose USA's defense.

peals has made it clear that there must be an agreement among co-venturers to "share in the profits of the business and submit to the burden of making good the losses." *Steinbeck*, 4 N.Y.2d at 317, 175 N.Y.S.2d 1, 151 N.E.2d 170. Courts in the Second Circuit and the State of New York consistently rely upon this provision of *Steinbeck* when reviewing claims asserted by parties seeking to establish the formation of a joint venture. Although there may be a common sense compulsion to conclude that these individuals entered into a joint venture, there is no legal basis to reach this conclusion under the law. This Court concludes, therefore, that there exists no genuine issue of material fact on the risk of loss element. The Defendants' motion for summary judgment affirming that the parties did not enter into a joint venture is granted and the Plaintiffs' cross-motion for summary judgment seeking confirmation that the parties entered into a joint venture is denied.[14]

E. *Plaintiffs' and Defendant Cosy Goose USA's Motions for Summary Judgment on Liability Claims*

1. Defendant Cosy Goose USA' Motion for Summary Judgment on Breach of Implied Warranty of Merchantability Counterclaim

Defendant Cosy Goose USA separately seeks summary judgment in its favor on its counterclaim based upon Plaintiffs Diktopoulos SA, Cosy Goose Hellas, and Tsitsivas Bros.' alleged breach of the implied warranty of merchantability. Cosy Goose USA contends that the shoes that Plaintiffs shipped were defective and that such deficiencies included broken shoe straps,

lose buttons and decorations, and dye that rubbed off of the shoes. *See* Defs' Mem. at p. 22. Cosy Goose USA asserts that these deficiencies fall within the implied protections afforded to purchasers of products under the Uniform Commercial Code and that summary judgment on this claim should be granted in its favor as a matter of law. *Id.*

■ A party asserting a claim based upon a breach of the implied warranty of merchantability must come forth with evidence establishing (1) a breach of the warranty and (2) proximate causation between the alleged breach and the party's damages. *See Bellevue South Assoc. v. HRH Constr. Corp.*, 78 N.Y.2d 282, 298–99, 574 N.Y.S.2d 165, 579 N.E.2d 195 (1991). The New York Court of Appeals has observed that the implied warranty of merchantability "does not mean that the product will fulfill a buyer's every expectation;" rather, the warranty "provides for a minimal level of quality." *Denny v. Ford Motor Co.*, 87 N.Y.2d 248, 258 n. 4, 639 N.Y.S.2d 250, 662 N.E.2d 730 (1995) (citations omitted).

This Court is unable to comprehend how Defendant Cosy Goose USA can seek summary judgment in its favor on this claim after defense counsel has argued to this Court that Defendant Weitman, through Cosy Goose USA, only acted as a distributor of Cosy Goose USA shoes and that none of the Defendants risked any degree of individual loss or liability based upon the Cosy Goose USA venture. Defendants have argued to this Court that Cosy Goose USA was essentially a passthrough corporation formed for the benefit of protecting the assets of Defendants Weitman and

14. In rendering this decision the Court is only dismissing Plaintiffs' accounting and constructive trust claims against Defendants Weitman and Laurevan due to the absence of a genuine issue of material fact as to whether there existed a joint venture among the par-

ties. Because Defendants Weitman and Laurevan have only sought summary judgment on this ground, the Court offers no other opinion on the propriety of the remaining clams asserted against them that do not rely upon the existence of a joint venture.

Laurevan, and that all of the proceeds of Cosy Goose USA, less Mr. Weitman's $50,000 salary, Laurevan's eight percent commissions, and the agreed upon expenses attributable to the operation of Cosy Goose USA, would be transferred back to Mr. Diktopoulos. *See* Weitman Aff. at ¶¶ 14, 16, 28, 30 (acknowledging reasons for forming Cosy Goose USA, the parties' understanding that they would renegotiate their agreement if and when the venture was profitable, that "there were no agreed-upon prices for the Cosy Goose shoes," and that the parties "would negotiate the amount of each payment" [from Cosy Goose USA to Mr. Diktopoulos], based upon the amount that Cosy Goose USA could afford to send to Diktopoulos SA); *see also* Pls' 56.1 Statement at ¶¶ 6, 7.

Based upon this undisputed arrangement, which the Court has concluded as a matter of law does not constitute a joint venture under New York law, there is no conceivable way that Defendant Cosy Goose USA could have sustained damages based upon the delivery of the alleged defective goods from the Plaintiffs *unless* Defendant Cosy Goose USA had been subject to a third party claim of liability arising from the sale of the shoes. In such a case, Cosy Goose USA would have to present this claim as one for contribution or indemnification against the Plaintiffs as manufacturers of the shoes, or, in light of Cosy Goose USA's corporate and financial structure, would forgo seeking recovery against the Plaintiffs because any loss Cosy Goose USA sustained would ultimately be borne by the Plaintiffs as the *de facto* financial backers of Cosy Goose USA.

Defendant Cosy Goose USA, however, has presented no such argument to explain how it was damaged as a result of the allegedly defective shoes transferred to it by Plaintiffs. Defendant Weitman, Cosy Goose USA's sole shareholder and presi-

dent, has personally affirmed that Cosy Goose USA did not pay for any of the shoes sent to it by Plaintiffs, *see* Weitman Aff. at ¶ 28; *see also* Pls' 56.1 Statement at ¶ 68 ("Defendants did not 'buy' the shoes from Plaintiffs and there were no prices for the shoes.") (citing Wetiman deposition testimony), and that the parties would periodically work out payment arrangements to send the proceeds of Cosy Goose USA back to Mr. Diktopoulos, *see* Weitman Aff. at ¶ 28. As argued by Plaintiffs, it does not appear that the Plaintiffs sold the shoes to Cosy Goose USA or that Cosy Goose USA is a buyer of the shoes; Cosy Goose USA is therefore not entitled to the protections of the implied warranty of merchantability under New York law. *See* N.Y. U.C.C. § 2–103(1)(a) (defining "buyer" as "a person who buys or contracts to buy goods"); *see also Weil v. Murray*, 161 F.Supp.2d 250, 256 (S.D.N.Y.2001) (discussing definition of buyer under New York U.C.C. provisions).

In further support of this observation I note that the defense counsel has argued that Cosy Goose USA neither requested nor ordered five shipments of shoes from Plaintiff Cosy Goose Hellas or from Plaintiff Tsitsivas Bros. This assertion undermines defense counsel's argument that Cosy Goose USA is a buyer of goods within the provisions of the New York U.C.C. and that therefore it is entitled to damages on this claim against the Plaintiffs. *See* Defs' 56.1 Statement at ¶¶ 17, 18 (alleging that Mr. Diktopoulos placed the orders with Cosy Goose Hellas and Tsitsivas Bros. for shoes shipped to Cosy Goose USA); *see also* Defs' Mem. at p. 17 ("Aristotelis Diktopoulos, acting unilaterally, placed orders with Cosy Goose Hellas and Tsitsivas. Aristotelis Diktopoulos made Cosy Goose USA liable for debts that he incurred . . .").

Defendants' motion for summary judgment on its counterclaim for breach of the

implied warranty of merchantability must be denied as factually unsupported and as without legal basis.[15]

### 2. Plaintiffs' Motion for Summary Judgment on Restitution Claim

Plaintiffs' claim against the Defendants for unjust enrichment and restitution does not rely upon the existence of a fiduciary relationship between the parties. The Second Circuit has instructed courts to consider such alternative theories of liability, including breach of contract or quasi-contract, in the absence of a fiduciary relationship between bargaining parties once the existence of a joint venture has been disaffirmed. *See B. Lewis Prod.*, 99 Fed. Appx. at 297 ("The district court did not, however, consider whether the Letter Agreement formed a contract other than a formal joint venture or exclusive agency agreement."). Plaintiffs' motion for summary judgment on their unjust enrichment claim seeks relief on such an alternative theory of liability.

After reviewing Plaintiffs' motion, however, the Court is concerned that there may be evidence exchanged between the parties during discovery that has not been presented to the Court that could aid the Court in deciding this branch of Plaintiffs' motion. It appears that the parties did not focus on this branch of the Plaintiffs' motion as earnestly as they briefed and argued the joint venture issue. In light of the Court's conclusion that the parties did not enter into a joint venture, prudence dictates that the parties should reevaluate their legal arguments and marshal the evidence exchanged in discovery in an effort to crystalize the undisputed facts surrounding the parties' agreement and the parties' actions taken in furtherance of that agreement.[16]

Accordingly, Plaintiffs' motion for summary judgment on their claim of unjust enrichment and restitution is denied without prejudice to renew within forty-five days of today's date. Plaintiffs should focus on whether there are undisputed material facts that establish liability against the Defendants as a matter of law on the remaining claims of an account stated, goods had and received, or unjust enrichment and restitution. The Court recognizes that the parties have disputed the exact number of shoes the Plaintiffs transferred to Cosy Goose USA, the cost of the shoes transferred, and who ordered the shoes from Cosy Goose Hellas and Tsitsivas Bros. Such precise facts, however, do not necessarily have to be established in order for the Court to determine that there is no genuine issue of material fact that shoes were transferred to Cosy Goose USA, that the shoes have not been returned to the Plaintiffs from Cosy Goose USA, or that Cosy Goose USA, or some other party, has benefitted from the transfer of the shoes.

In light of the fact that these issues do not appear to have been fully considered or briefed by counsel, and out of concern that the Court would be adjudicating Plaintiffs' motion for summary judgment on an incomplete record, Plaintiffs' motion

---

**15.** In light of the conclusions rendered herein, it would appear that several of the Defendants' counterclaims suffer from similar factual and legal defects. The Court, however, offers no ruling on the propriety of these claims in the absence of any motion challenging their sufficiency.

**16.** In raising this possibility of additional motion practice, the Court emphasizes that the parties remain bound by the filings made in connection with these motions, including their Local Rule 56.1 Statements and their responsive 56.1 statements. The parties need not reassert these facts in any subsequent filings made to the Court. The facts found to be undisputed or deemed to be admitted in this Decision are binding on counsel in any such additional motion.

for summary judgment as to their liability claim is denied without prejudice to renew within forty-five days of today's date.

## CONCLUSION

For the aforementioned reasons, Defendants Weitman and Laurevan's motion for summary judgement challenging the existence of a joint venture under New York law is granted, Plaintiffs' cross-motion for summary judgment seeking confirmation of a joint venture is denied, Defendant Cosy Goose USA's motion for summary judgment on its breach of the warranty of merchantability counterclaim is denied, and Plaintiffs' motion for summary judgment on their claim of unjust enrichment and restitution is denied without prejudice to renew within forty-five days of today's date. The Clerk of the Court should mark Docket numbers 69 and 70 as granted in part and denied in part and Docket number 73 as denied without prejudice to renew.

This constitutes the Decision and Order of the Court.

**SO ORDERED.**